**David L. RICE, Petitioner,**

v.

**Charles L. WOLFF, Jr., Warden of the Nebraska Penal and Correctional Complex, Respondent.**

**No. CV72-L-303.**

United States District Court, D. Nebraska.

March 29, 1974.

Supplemental Opinion July 5, 1974.

David L. Herzog and J. Patrick Green, Omaha, Neb., for petitioner.

Melvin Kammerlohr, Asst. Atty. Gen., for respondent.

## MEMORANDUM

URBOM, Chief Judge.

David L. Rice has filed a petition for writ of habeas corpus in which he seeks release from the Nebraska Penal and Correctional Complex on the ground that his incarceration is in violation of the Constitution of the United States. The petitioner has been incarcerated at the Penal Complex since his conviction by a jury in the District Court of Douglas County, Nebraska, of the crime of first degree murder in the bombing death of Omaha police officer Larry D. Minard, Sr. The case has been submitted to this court on the state court record. After long and careful consideration, this case is ready for decision, at least in part.

A brief recitation of the facts surrounding the petitioner's conviction would be helpful. Early on the morning of August 17, 1970, the Omaha police department received an emergency telephone call purportedly originating from 2865 Ohio Street. The caller informed the emergency operator that a girl or woman was screaming for help from a vacant house next door at 2867 Ohio Street. Several patrol cars responded to this emergency call, including that of Officer Minard. Minard and several other officers entered the vacant house. In the course of entering, the officers noticed a suitcase lying on its side in the doorway. While the search was being conducted an explosion occurred which killed Minard. At the time of the explosion Officer Minard was standing near the suitcase and apparently

inspecting it. Later investigation determined that the explosion was caused by dynamite contained in the suitcase which had been rigged as a booby trap. Intensive police investigation led to the conclusion that Duane Peak was a prime suspect in the case. Peak was a known member of the National Committee to Combat Fascism (NCCF). The investigation also revealed that Edward Poindexter, an officer of the NCCF, was capable of rigging a booby trap bomb. Warrants were issued for the arrest of both Peak and Poindexter. The Omaha police conducted a search of the headquarters of the NCCF pursuant to the arrest warrants. Neither Peak nor Poindexter was found at the headquarters, but Poindexter was arrested shortly after the conclusion of the search. Prior to the bombing death of Minard, the Omaha police had received a tip that dynamite might be stored at the home of the petitioner. The Omaha police did not act on that tip until after the search of the NCCF headquarters. That same night two Omaha police officers obtained a search warrant for the petitioner's house at 2816 Parker Street.[1] Pursuant to this search warrant and the arrest warrant for Peak, a search of this house was conducted. This search discovered several items which were subsequently introduced into evidence at the petitioner's trial: blasting caps with wire (photograph substituted), dynamite wrapper (taken from dynamite found in the house), orange grip pliers, a battery, and some dynamite. The petitioner turned himself in to the police after learning that there was an arrest warrant out for him. After his arrest the petitioner's clothing was removed from safekeeping in the Douglas County, Nebraska, jail and subjected to examination by the crime laboratory of the Alcohol, Tobacco and Firearms Division of the Treasury Department in Washington, D. C. This examination revealed dynamite particles in the pockets of the clothing. This evidence was also introduced at trial. Peak was subsequently arrested and testified at Rice's trial that the petitioner was involved in the murder. The petitioner was convicted as one of the instigators of the crime.

The petitioner alleges that he is being incarcerated in violation of the United States Constitution in the following respects:

1. His conviction rests upon evidence that was seized in violation of the Fourth Amendment's prohibition of unreasonable searches and seizures in that the search of 2816 Parker Street was conducted pursuant to a search warrant which was issued with-

---

1. The affidavit in support of the search warrant reads as follows:

"The complaint and affidavit of Sgt. R. Pfeffer, and Sgt. Jack Swanson, on this 22 day of August 1970, who, being first duly sworn, upon oath says:

"That he has just and reasonable grounds to believe, and does believe that there is concealed or kept as hereinafter described, the following property, to-wit: Dynamite and devices which could be used to construct devices which could cause injury to persons and damage to property, Also illegal weapons which he stated should be used against Police Officers.

"That said property is concealed or kept in, on, or about the following described place or person, to-wit: A one story white frame house on Parker Street at 2816, In Omaha Douglas County, Nebraska.

"That said property is under the control or custody of David Lewis RICE, Minister of Information, National Committee to Combat Fascism.

"That the following are the grounds for issuance of a search warrant for said property and the reasons for his belief, to-wit: David Rice is a known member of the National Committe [sic] to Combat Fascism, which advocates the violent killing of Police Officers. A violent killing of a Police Officer occured [sic], in Omaha, and arrests were made from the membership of the CCF. We have been told in the past that RICE keeps explosives, at his residence, and also illegal weapons, which he has said should be used against Police Officers.

"A warrant authorizing a night-time search is requested because Nighttime when information was secured, and the property may be removed.

"WHEREFORE, he prays that a search warrant may issue according to law."

out probable cause due to an insufficient supporting affidavit;

2. The search of his clothing and seizure of dynamite particles found therein was based solely on the information obtained pursuant to the illegal search of 2816 Parker Street, and the particles, therefore, became fruit of the poisoned tree, and in any event the clothing was searched without a warrant, which in and of itself would make the search illegal.

The respondent urges that even if the search warrant was issued without probable cause, nonetheless the search of the petitioner's premises was constitutionally permissible, because the evidence was discovered incident to a search for Duane Peak pursuant to a valid arrest warrant for Peak.

■ The petitioner has clearly exhausted available state court remedies, as required by 28 U.S.C. § 2254(b), regarding the validity of the search warrant. The Supreme Court of Nebraska in affirming the conviction held that the search warrant was issued with probable cause. State v. Rice, 188 Neb. 728, 199 N.W.2d 480 (1972). Thus this court may deal with this question on the merits.

## I.

■ The record contains no evidence that any information outside the affidavit was presented to the magistrate. In part the Supreme Court of Nebraska rested its finding of validity in the search warrant upon information which the police officers had but which was not revealed to the magistrate. In my opinion, such consideration is not acceptable under federal constitutional standards. The fundamental purpose of a warrant is to place behind the force of the warrant a detached magistrate's objective evaluation of information. He cannot evaluate information not known to him and the propriety of his action should be determined from what he knew, not from what someone else knew or later came to know. An analysis of the validity of the search warrant must be made from the affidavit alone, because nothing else was considered by the magistrate.[2]

Neither Whitely v. Warden, Wyoming State Penitentiary, 401 U.S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971), nor Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), relied upon by the Supreme Court of Nebraska, supports a contrary view.

It must be kept in mind that testing the validity of a search *warrant* is different from testing the validity of a *search* in the absence either of any search warrant or of a valid search warrant. So, also, testing the validity of an *arrest warrant* is different from testing the validity of an *arrest* in the absence either of any arrest warrant or of a valid arrest warrant.

■ *Draper* involved an arrest in the absence of any arrest warrant; *Whitely* involved an arrest in the absence of a valid arrest warrant. In each, information not presented to a magistrate was permitted for testing the validity of the *arrest*, not for the purpose of testing the validity of a *warrant*. Consistently, in the present case knowledge of the searching officers beyond that presented to the magistrate may be considered in testing the validity of the search, if the search warrant is invalid, but may not be used in testing the validity of the search warrant. For the moment, then, consideration is limited to the affidavit, because the issue is the validity of the warrant.

■ Additionally, the tip is essential to the validity of the warrant. This

---

2. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) ; Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) ; Wangrow v. United States, 399 F.2d 106 (C.A.8th Cir. 1968), cert. denied 393 U.S. 933, 89 S.Ct. 292, 21 L.Ed.2d 270 ; United States v. McDonnell, 315 F.Supp. 152 (U.S.D.C.Neb. 1970). A possible exception is evidence tending to discredit or impeach the assertions of the affidavit. United States v. Roth, 391 F.2d 507 (C.A.7th Cir. 1967).

follows, since this is a search warrant and therefore must contain reasons for believing that a particular item is to be found in a particular place. The only averment linking the petitioner's house with criminal activity is the averment in the tip that Rice keeps explosives at his residence. The mere allegations that David Rice is a known member of the NCCF which advocates violent killing of police officers, that David Rice is Minister of Information of the NCCF, that a violent killing of a police officer occurred recently in Omaha, and that arrests have been made from the membership of the NCCF, would not give a magistrate probable cause to issue a search warrant for explosives at David Rice's home. This would amount to issuance of a warrant upon the basis of reputation alone, and this is forbidden by Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933). See also, United States v. Harris, 403 U.S. 573, 582, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Hence, this case may be analyzed in accordance with the line of decisions wherein tips were essential to the validity of the search warrants.

Prior to United States v. Harris, supra, the obvious starting place for analysis was Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In *Harris,* the plurality opinion of Chief Justice Burger de-emphasizes the significance of *Aguilar* and takes as its benchmark Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). This part of the Chief Justice's opinion is joined in by only two other justices, however. Moreover, the Chief Justice's opinion makes it clear that *Aguilar* is not being overruled. 403 U.S. 573, 577, 91 S.Ct. 2075, 29 L.Ed.2d 723. Additionally, the Eighth Circuit Court of Appeals views *Aguilar* as the proper starting point despite *Harris.* LeDent v. Wolff, 460 F.2d 1001 (C.A. 8th Cir. 1972); United States v. Marihart, 472 F.2d 809, 813 n. 5 (C.A. 8th Cir. 1972); United States v. Smith, 462 F.2d 456 (C.A. 8th Cir. 1972). Accord, United States v. McNally, 473 F.2d

934 (C.A. 3rd Cir. 1973); United States v. Davenport, 478 F.2d 203 (C.A. 3rd Cir. 1973); United States v. Black, 476 F.2d 267 (C.A. 5th Cir. 1973). Therefore, this court takes as its starting place for analysis the *Aguilar* decision.

In *Aguilar* the court held that where an affidavit supporting a search warrant is based on hearsay information the magistrate must be informed of two sets of circumstances: first, some of the facts from which the informant has concluded that the items to be seized are where he claims they are; and second, some of the facts from which the officer concludes that the informant is credible or his information reliable. 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L. Ed.2d 723. The affidavit here is deficient under this standard, because no information was given to the magistrate regarding the first set of circumstances. Nothing was said regarding the basis on which the informant concluded that there was dynamite at Rice's house. The affidavit also fails the second part of the *Aguilar* standard, since the other averments in no way deal with the credibility of the unnamed informant or attempt to show that his information is reliable by, for example, detailing subsequent police corroboration of the tip. See Spinelli v. United States, 393 U.S. 410, 416–418, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

This is not the end of a proper analysis however, since *Aguilar* has been supplemented by *Spinelli.* In that case the Supreme Court held that an affidavit not satisfying the *Aguilar* standard is still acceptable if the averments in the affidavit, aside from the tip, so corroborate the tip that it is "as reliable as one which passes *Aguilar's* requirements when standing alone." 393 U.S. at 416, 89 S.Ct. at 589. When, as here, the manner in which the informant gathered his information is not told to the magistrate, the court in *Spinelli* held:

". . . [I]t is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know

that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation."

393 U.S. at 416, 89 S.Ct. at 589. *Spinelli* used Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), as the standard for determining whether the tip described the criminal behavior in sufficient detail. In *Draper*, which as mentioned above involved probable cause to arrest without a warrant, the tip stated the address in Denver where the suspect had taken up residence; that the suspect had gone to Chicago on September 6, 1956, by train; that he was going to bring back three ounces of heroin; that he would return by train either on the morning of September 8, 1956, or the morning of September 9, 1956; that the suspect was a Negro of light brown complexion, 27 years old, 5 feet 8 inches tall, weighed about 160 pounds, and would be wearing a light colored raincoat, brown slacks and black shoes; that he would be carrying a tan zipper bag; and that he habitually walked fast. The obvious intent of the standard announced in *Spinelli* is to give the magistrate sufficient detail to make it apparent that the informant gathered his information in a reliable manner and was not simply repeating unfounded rumors. The mere statement that "Rice keeps explosives, at his residence, and also illegal weapons, which he has said should be used against Police Officers" does not describe the criminal behavior in the detail required by *Spinelli*.

*Spinelli* should not be read, however, as saying that the only way to make up for an affidavit deficient in the light of *Aguilar* is to describe the criminal behavior in a very detailed manner. The court goes on to state:

"This is not to say that the tip was so insubstantial that it could not properly have counted in the magistrate's determination. Rather, it needed some further support. When we look to other parts of the application, however, we find nothing alleged which would permit the suspicions engendered by the informant's report to ripen into a judgment that a crime was probably being committed.

393 U.S. at 418, 89 S.Ct. at 590.

The relevant judgment here would be that David Rice's home contained dynamite and other illegal weapons. The affidavit in *Spinelli*, in addition to stating a tip concerning the operation of a handbook and wagering by telephone, contained a report of detailed F.B.I. surveillance on Spinelli, a confirmation that the telephone numbers listed in the tip were those of an apartment which the F.B.I. observed Spinelli enter, and an affirmation by the F.B.I. agent seeking the warrant that Spinelli was known to him and to local law enforcement officials as a bookmaker and gambler and associate of gamblers and bookmakers. The Supreme Court held that the behavior detailed by the F.B.I. surveillance contained no suggestion of criminal conduct and that the reputation for criminal behavior may not be used to give additional weight to allegations that would otherwise be insufficient. In Rice's case, the averments that he is a member and Minister of Information of the NCCF which advocates the violent killing of police, that a policeman has been killed, and that arrests have been made from the membership of the NCCF, in no way suggest that dynamite would probably be stored at the petitioner's house. Perhaps such averments make it more likely that dynamite would be found in Rice's house than in the house of someone else whom an unnamed informant accused of storing dynamite and about whom nothing else was known. But they do not lend sufficient support to the tip to permit suspicion to harden into a judgment that dynamite was probably in Rice's house. Mere advocacy of violence does not in and of itself license the police to search the premises of the advocate. Such activity, provided it does not involve incitement to specific acts, is constitutionally protected

free speech. Yates v. United States, 354 U.S. 298, 318–319, 77 S.Ct. 1064, 1 L. Ed.2d 1356 (1957). The violent killing of a police officer would certainly render suspect a group advocating the violent killing of police. The fact that arrests had already been made from the group would further heighten suspicion of involvement in the crime by the group. The strongest implication, however, that can be drawn from these assertions is that dynamite probably was on the premises of some member of the group at some time. They do not imply that dynamite was probably on Rice's premises at the time the warrant was sought. It is this latter inference that the standard of probable cause requires to be made. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). The only averment besides the tip that singles the petitioner out is the one that he is Minister of Information. But being Minister of Information does not imply that one probably stores dynamite and other illegal weapons. Perhaps if the allegation were that Rice was Weapons Minister or something of that sort, it would help tighten the inference down to a particular place. The key failing of the averments, then, is that they fail to tie down the storage of dynamite to any particular place. Such particularity is required before a search warrant may issue.

While I do not think that *Harris* changed the standards of *Aguilar* and *Spinelli,* it may be useful to analyze the present case against the factual setting of *Harris.*

Chief Justice Burger's plurality opinion in *Harris* relies upon Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960), for setting the standard for the quantum of information necessary to support a belief that an unidentified informant's information is truthful. The affidavit in *Jones* concerned the tip of an unidentified informant who claimed that he had recently purchased narcotics from the defendant. The tip also described the apartment where the informant alleged

he had purchased the narcotics. The remainder of the affidavit swore that the informant was familiar to the affiant, that the informant had given information to the affiant before and that that information was accurate, and that the same information was given by other informants. Moreover, the tip itself was an admission against penal interest. In applying *Jones* to the facts in *Harris,* the Chief Justice characterizes *Jones* as stating that the affidavit is sufficient if there is a substantial basis for crediting the hearsay of the informant. The affidavit in *Harris* related a tip that the informant had purchased illicit whiskey from Harris at a specific house. It also stated that Harris had a reputation personally with the affiant as being a trafficker in nontaxpaid distilled spirits, that the affiant had received information from a variety of sources concerning Harris' activities, that illicit whiskey had actually been found on Harris' premises before, and that the affiant found the informant to be "prudent." The Chief Justice found substantial basis for crediting the hearsay here for the following reasons: first, it purported to relate the personal observations of the informant; second, it recited prior criminal behavior supportive of the reputation for criminal behavior; and third, the statement of the informant was against his penal interest. 403 U.S. at 581, 583, 91 S.Ct. 2075. The Chief Justice noted that the affidavit contained no averment that the informant had previously given correct information as did the affidavit in *Jones.* The absence of such an averment, however, was found not essential to meeting the standard set down by *Jones.* 403 U.S. 573, 581–582, 91 S.Ct. 2075. Applying the three factors critical to upholding the affidavit in *Harris* to the affidavit before this court, it can be seen that none of the three is present. The informant does not purport to relate his own personal observations; there is no recital of prior criminal acts by the petitioner to support a reputation for violence against police; and the state-

ment of the informant is in no way against his penal interest. Hence, the affidavit in this case does not contain the pivotal facts relied upon by Chief Justice Burger in *Harris.*

Therefore, it is the holding of this court that the affidavit supporting the request for a search warrant did not give the magistrate probable cause to issue the warrant and that the warrant was therefore issued without probable cause.

## II.

Even assuming the invalidity of the search warrant, the respondent argues that the search and seizure of the dynamite were proper, because done under exigent circumstances or in the course of a lawful search for Duane Peak.

The arguments on both sides of these questions were fully briefed to the Supreme Court of Nebraska in the petitioner's criminal appeal. The opinion of that court hints that the search and seizure might have been upheld on either of these grounds given the evidence before the court, but these issues were not explicitly decided by the Supreme Court of Nebraska, since it upheld the validity of the search warrant. This status of the case raises the question of whether the requirement of Title 28 U.S.C. § 2254(b) that available state court remedies be exhausted before the federal district court may reach the merits of an issue raised on habeas corpus has been fulfilled.

█ It is clear from Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), that all that is required is that the issue raised on federal habeas was previously fairly presented to the state's highest court. For a gloss on what this means the court cites Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971); Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct. 194, 19 L.Ed.2d 41 (1967); and Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). None of these cases rests on drawing a distinction between pre-

senting an issue to the state's highest court and presenting that issue and having it decided by the state's highest court. The thrust of these decisions is that once an issue has been decided by the state's highest court, that is sufficient for exhaustion even though the petitioner could use some other procedural device to challenge his conviction again in the state courts at the time the court is deciding the habeas matter.

Nevertheless, the language of *Picard* and of Fay v. Noia, 372 U.S. 391, 83 S. Ct. 822, 9 L.Ed.2d 837 (1963), is that of fair presentation and of an "opportunity to pass upon." Nowhere is there language suggesting that the state court must in fact pass upon the issue. *Picard* puts a paragraph gloss upon the requirement of fair presentation. The critical element is that the state court has the first opportunity to hear the very claim urged in federal court. In support of this proposition the court cites Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761 (1950), and Davis v. Burke, 179 U.S. 399, 21 S.Ct. 210, 45 L.Ed. 249 (1900). Both of these cases also speak of the presentation of the issue first to the state court and are otherwise unilluminating.

*Picard* offers further enlightenment on what fair presentation means by holding that the presentation of the same facts to state court is not sufficient. The same constitutional claim must be brought to the attention of the state courts. The most telling paragraph of the entire opinion is as follows:

". . . Obviously there are instances in which 'the ultimate question for disposition,' United States ex rel. Kemp v. Pate, 359 F.2d 749, 751 (CA 7 1966), will be the same despite variations in the legal theory or factual allegations urged in its support. A ready example is a challenge to a confession predicated upon psychological as well as physical coercion. See Sanders v. United States, 373 U.S. 1, 16, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963). Hence, we do not imply

that respondent could have raised the equal protection claim only by citing 'book and verse on the federal constitution.' Daugharty v. Gladden, 257 F.2d 750, 758 (CA 9 1958); see Kirby v. Warden, 296 F.2d 151 (CA 4 1961). We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts. . . ."

404 U.S. at 277–278, 92 S.Ct. at 513. The thrust of this paragraph and the cases cited therein is that exhaustion does not require either identity of legal theory or of factual allegation. The *Kemp* case is most enlightening in that it seems to require that the evidence in the record before the state court be essentially the same as that before the federal habeas court. The court in *Daugharty* arrives at essentially the same position in stating that the state court must be provided with all of the facts necessary to give application to the constitutional principle upon which the petitioner is relying. Neither of these cases, however, appears to be cited by the Supreme Court for the purpose of noting this part of the opinion.

The proper conclusion of all of this is that the United States Supreme Court opinions leave open the precise question before this court—namely, whether the Supreme Court of Nebraska was presented the substance of the federal habeas claim.

Further help may be found in LeDent v. Wolff, 460 F.2d 1001 (C.A. 8th Cir. 1972). The court in footnote 2 states that the Supreme Court of Nebraska did not have the opportunity to pass upon an issue which was presented to it, since there was "no meaningful record for it to review on this issue." In *LeDent* no testimony was produced on the issue raised to the Supreme Court of Nebraska.

■ Thus this court must follow the standard announced in *LeDent*. After a careful reading of the entire record before the Supreme Court of Nebraska touching these issues, including the re-cently submitted police reports which were introduced into evidence in the hearing on the motion to suppress which took place prior to the petitioner's trial, it is the holding of this court that there was a meaningful record before the Supreme Court of Nebraska from which it could have decided these issues. Thus there has been exhaustion of available state court remedies and this court may decide these issues on their merits.

■ Before this court makes such a decision, however, it is desirable that all possible evidence on these issues be presented. This court has plenary power to conduct an evidentiary hearing and to try facts anew in cases involving the issuance of the writ of habeas corpus. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). I am hopeful that the record can be made more complete in the following two respects: first, evidence bearing on the issue of probable cause to believe that Duane Peak was in the petitioner's house at the time the search was conducted; and second, evidence bearing on the issue of whether the dynamite found in the petitioner's basement cubbyhole was in an area in which a man could hide and was in plain view.

This evidentiary hearing limited to these issues should be held as expeditiously as possible, since this case has been under consideration by this court for a very long time. The time for the hearing will be set by separate order following consultation with attorneys for the respective parties.

### SUPPLEMENTAL OPINION

Pursuant to the memorandum and order of this court dated March 29, 1974, an evidentiary hearing was held on June 11, 1974, on the following issues: First, whether there was probable cause to believe that Duane Peak was in the petitioner's house on the night of August 22, 1970; and second, whether the objects found in the search of the house and introduced at the petitioner's trial were in plain view.

The issues as yet unresolved by this court are:

A. Whether the introduction into evidence of the dynamite and other items found in the petitioner's house on August 22, 1970, can be justified on the ground that the police were rightfully on the petitioner's premises to execute an arrest warrant for Duane Peak and the evidence was found in plain view;

B. Whether the introduction of these items into evidence can be justified on the ground that exigent circumstances were present at the time of the search of the premises; and

C. Whether the reception into evidence of dynamite particles found in the clothing of the petitioner after his arrest was constitutionally permissible.

If issue numbered A is to be resolved in favor of the respondent, it must appear, first, that the police were rightfully on the premises, and, second, that the evidence seized was in plain view. The second question need not be reached if the police were not rightfully on the premises. Therefore, the first question to be resolved is whether the police were rightfully on the petitioner's premises in executing an arrest warrant for Duane Peak.

■■■ Resolution of this first issue depends initially upon whether the police were in fact at David Rice's house to execute an arrest warrant for Duane Peak. This need not have been their sole purpose in entering the house, but it must be one of their purposes. See Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). The record as a whole reveals that one of the officers' purposes in being at Rice's house was to arrest Duane Peak.

There is some discussion in the brief of the petitioner that the arrest warrant for Duane Peak was invalid, but there is no substantial evidence to support this claim and the issue has not been pressed by the petitioner. Hence, the discussion that follows will assume that the police had a valid arrest warrant for Duane Peak.

■■■ Testimony before this court in the evidentiary hearing just completed revealed that none of the officers participating in the search of the petitioner's premises had the arrest warrant for Duane Peak personally in his possession. Such possession is not required by the Constitution in order to validate an entry to effect an arrest. United States v. Leftwich, 461 F.2d 586 (C.A. 3rd Cir. 1972), cert. denied, 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178; Gill v. United States, 421 F.2d 1353 (C.A. 5th Cir. 1970), cert. denied, 400 U.S. 851, 91 S.Ct. 85, 27 L.Ed.2d 89. See Rule 4(c)(3) of the Federal Rules of Criminal Procedure.

■■■ The issuance of a valid arrest warrant, however, does not serve as a license to the police to enter a private dwelling to effect an arrest. The Fourth Amendment secures to the people of this nation "the right . . . to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In interpreting the meaning of this fundamental guarantee courts have held that a search is not reasonable unless the officer executing the arrest warrant had probable (or reasonable) cause to believe that the person named in the warrant is on the premises at the time of the entry. Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972); Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970); Michael v. United States, 393 F.2d 22 (C.A. 10th Cir. 1968); United States v. Harris, 391 F.2d 384 (C.A. 6th Cir. 1968); United States v. Chambers, 382 F.2d 910 (C.A. 6th Cir. 1967); Lankford v. Gelston, 364 F.2d 197 (C.A. 4th Cir. 1966); United States v. Alexander, 346 F.2d 561 (C.A. 6th Cir. 1965); United States v. Blair, 366 F.Supp. 1036 (U.S.D.C.S.D.N.Y.1973); United States v. Watson, 307 F.Supp. 173 (U.S.D.C.D.C.1969); United States

v. Sims, 231 F.Supp. 251 (U.S.D.C.Md. 1964). See D. Rotenberg and L. Tanzer, "Searching for the Person to be Seized," 35 Ohio State Law Journal 56–77 (1974) and Note, "The Neglected Fourth Amendment Problem in Arrest Entries," 23 Stanford Law Review 998–1008 (May 1971). The rationale for this requirement is that, unless the person sought is on the premises, the officer executing the arrest warrant cannot accomplish his task, and entrance into the home to execute an arrest warrant should be permitted only when such entrance has a reasonable probability of achieving its goal.

■ The question for resolution, then, is whether the police had probable (or reasonable) cause to believe that Duane Peak was in the petitioner's house on the night of August 22, 1970. The courts noted above do not shed much light on just what probable or reasonable cause means in these circumstances. In the context of discussing probable cause to arrest the Supreme Court of the United States has offered some elucidation of the term. In Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), the court said that the substance of all the definitions of probable cause is a reasonable ground for belief. It is more than a bare suspicion. Rather, "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543." 338 U.S. at 175–176, 69 S.Ct. at 1311. See also Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), and Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The only court to articulate the standard in the context of determining probable cause to enter private dwellings to execute arrest warrants, even by implication, is the Fourth Circuit Court

of Appeals in Lankford v. Gelston, 364 F.2d 197 (C.A. 4th Cir. 1966). In that case the court gave its approval to a statement of the law of arrest in a regulation issued by the Police Commissioner of Baltimore. The regulation's relevant portions are as follows:

"A police officer may make a peaceable or a forcible entry to search any premises for the purpose of arresting a person for whom an arrest warrant has been issued, if, but only if, the officer has probable cause to believe the accused person to be on the premises to be searched.

"In this context, 'probable cause' is said to exist where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that the accused person is on the premises to be searched."

364 F.2d at 200–201, n. 4.

This standard, as is obvious, is deduced from the standard for probable cause in other settings. Such a deduction is eminently reasonable and will be adopted by this court as setting the constitutional standard.

Having achieved some articulation of the standard, this court is now in a position to assess the facts of this case. In so assessing the facts it is well to bear in mind that the burden of persuasion is on the petitioner to convince this court that the evidence should have been suppressed and thus that the police did not have probable cause to believe that Duane Peak was on the petitioner's premises on the night in question.

The evidence shows that the police at the time of the search knew of the following facts arguably showing a connection between Duane Peak and David Rice's house:

1. Duane Peak was a member and David Rice and Edward Poindexter were officers of the NCCF, which advocated violence against

the police, and which had a limited membership;

2. David Rice's house had been used at times as a meeting place for the NCCF;

3. David Rice and Edward Poindexter had written articles in the NCCF newspaper urging violence against the police;

4. The focus of the investigation of the Minard killing was then on the NCCF;

5. There was probable cause to believe that Duane Peak planted the suitcase bomb that killed Officer Minard;

6. Donald Peak, Jr., implicated Edward Poindexter;

7. Arrest warrants had been issued for Duane Peak and Edward Poindexter;

8. An informant had told the police that he overheard David Rice in discussing the bombing say that the action was a week late and that Rice then laughed;

9. Another informant had told the police that David Rice had received orders from New York either to kill a police officer or lose the Panther franchise;

10. The police had reports that there was dynamite in the community that had not yet been found;

11. Duane Peak had been at David Rice's house in the past, but there had been no reports of his being there since the bombing;

12. Unsuccessful attempts had been made immediately before the search of Rice's house to find Duane Peak at the NCCF headquarters and at the home of Frank and Will Peak's parents, and generally on the near north side in Omaha;

13. The lights and television were on at David Rice's house when the police arrived, but no one responded to their knock at the door;

14. While Sergeant Swanson was at police headquarters typing out the search warrant affidavit there was a report that Duane Peak was in the Spencer Street Housing Project, the location of which is not revealed in the record;

15. None of the police reports of interviews with Duane Peak's relatives prior to the search of David Rice's house give any indication that Duane could be found at David Rice's house.

There was further testimony before this court which, if believed, would tighten the connection between Duane Peak and David Rice's house. Lieutenant James G. Perry testified that Delia Peak had told him that David Rice, Duane Peak and Edward Poindexter were constant companions and that he, Lt. Perry, was present when Donald Peak, Jr., told Officer Pitmon Foxall that Duane Peak was at David Rice's house when the bomb was made. Lt. Perry also testified that Duane Peak had not been seen in the last two days by his family and that they expressed concern that he may have been eliminated. The remainder of the record before this court specifically contradicts the claim that the police knew from Donald Peak, Jr., that Duane Peak was in David Rice's house when the bomb was made. These are the facts in the record: First, the detailed police reports of Pitmon Foxall on his interviews with Donald Peak, Jr., on August 22, 1970, make no mention of Duane Peak's being at the Rice house when the bomb was made; second, no such fact was mentioned by either Lt. Swanson or Sgt. Pfeffer either before this court or in testimony at the state trial; third, no mention of this crucial fact was made in the affidavit to support the search warrant for searching David Rice's house; fourth, the rights advisory forms signed by Donald Peak, Jr., before his interviews on August 22, 1970, positively indicate that no one else was present at these interviews besides Donald Peak, Jr., and Officer Foxall; and

fifth, the initial warrant for the arrest of David Rice was for possession of explosives and not for conspiracy to commit first degree murder, and this warrant did not issue until after the search of Rice's premises. This last consideration is significant, because immediately following Donald Peak, Jr.'s, interviews, in which Duane Peak and Edward Poindexter were implicated in the murder, arrest warrants were issued for them charging them with first degree murder. Had Donald Peak, Jr., so implicated David Rice, surely a similar arrest warrant for him would have been issued at that time. Given these facts I simply cannot credit this testimony of Lt. Perry.

The fact that one part of Lt. Perry's testimony is not creditable does not necessarily imply that the remainder is similarly tainted; by itself, it simply raises a question concerning his memory. Lt. Perry's testimony that Delia Peak told him that Duane Peak, Edward Poindexter and David Rice were constant companions is in no way corroborated by the remainder of the record before me. The police report of her interview reveals nothing about Duane Peak's being a constant companion of David Rice's, and the rights advisory form she signed indicates that only Sgt. R. Alsager and Richard Curd were present for her interview. Moreover, her interview did not begin until the very hour police first approached David Rice's house and was not completed until after the decision had been made to enter his house. The police report of her interview also reveals that she had seen Duane Peak at about 5:00 p. m. the night before. Thus, it simply is not so that Duane Peak's family had not seen him in the two days before they entered the petitioner's house and is persuasive that Delia Peak did not make a contrary statement. Finally, there is no indication in the police reports of interviews with Duane Peak's family prior to the entry of Rice's house that they were concerned that he might have been eliminated. On the basis of the entire record before this court and having heard and seen Lt. Perry testify, it is impossible for me to credit his testimony in the respects mentioned. Consequently, I find that his testimony in these respects cannot be included in the above catalogue of facts within the knowledge of the police at the time they entered the home of David Rice.

Lt. Perry also testified that he was the person who put David Rice's house on the list of places to look for Duane Peak. He testified that he did so because Delia Peak told him that David Rice, Duane Peak and Edward Poindexter were constant companions and because Donald Peak, Jr., told Officer Foxall that Duane Peak was at Rice's house when the bomb was made. Since both of these statements are not creditable, the most that can be said is that the record does not reveal why Lt. Perry placed Rice's house on the list of places to be searched for Duane Peak. Lt. Swanson testified that the only information he had tying Duane Peak to the house was that Duane Peak and David Rice were members of the NCCF and that Duane Peak had been known to go to that house for meetings.

 Based on the above catalogue of facts it is the finding of this court that the police officers did not have probable cause to believe that Duane Peak was in David Rice's house at the time they searched it on August 22, 1970. The critical considerations are that the place searched was not the residence of the person sought pursuant to the arrest warrant, that there had been no reports of Duane Peak's being at the home of David Rice for at least five and a half days prior to entry, that none of Duane Peak's family suggested looking for him there, and that the police had a contemporaneous report that Duane Peak was elsewhere. Such facts could not warrant a man of reasonable caution to believe that Duane Peak was in the house at the time of entry. It is a fair inference from the facts to say that Rice's house was a place Duane Peak might be. But this was not sufficient to permit entry, absent consent from the person

whose house it was. The fact that the television and lights were on and there was no response to the police knock certainly would authorize the inference that someone had been there recently. Whether it, standing alone, would authorize the inference that someone was there at the time is questionable. In United States v. Watson, 307 F.Supp. 173 (U.S.D.C.D.C.1969), the court held that the facts that the police had called the house of the person to be arrested prior to going to the house and received a busy signal and that the radio was playing when the police arrived at the house did not give the police probable cause to believe the homeowner was at home at the time of entry, since they saw and heard no other signs of physical presence. I need not decide this issue, however, because in any event the fact that the lights were on and the television playing in no way indicated that Duane Peak was a person present at David Rice's house.

This court is not unmindful of the case of Vance v. State of North Carolina, 432 F.2d 984 (C.A. 4th Cir. 1970), which held that on the facts before it the absence of an indication in the record that the police had any particular reason for believing that the person sought pursuant to the arrest warrant was on the premises searched was not fatal to the validity of the conviction in question. The crucial fact distinguishing this case is that the premises in question in *Vance* were the premises of the person sought in the arrest warrant. Here, Peak did not live at or own the premises searched. Moreover, the court in *Vance* stressed that the entry was made in the early afternoon and not at night. Hence, the rule announced by the court in *Vance*, read against the background of Lankford v. Gelston, supra, appears to be that if the entry is made during normal daylight hours, the police have probable cause to believe that the person sought in an arrest warrant is at his home. Whatever the validity of this rule in this circuit, it has no application to this case.

My decision that there was not probable cause to believe that Duane Peak was at David Rice's house at the time of the search in no way will seriously hamper proper police investigation of crimes such as the murder of Officer Minard. Had Duane Peak in fact been in Rice's house a careful police surveillance of the house would no doubt have revealed his presence while at the same time preserving the fundamental rights guaranteed by the Fourth Amendment. Such surveillance procedures may take somewhat longer to apprehend the person sought, but the price of shortening the search by allowing an arrest warrant to serve as a license to search private dwellings where the person sought *might be* simply is too high.

The respondent has pressed another argument for allowing police presence in David Rice's house at the time of the search. In oral argument before this court following the evidentiary hearing the respondent argued that the existence of exigent circumstances should reduce the level of probable cause required. This argument is urged both as to the search for the dynamite and the search for Duane Peak.

The doctrine of exigent circumstances was developed originally in regard to warrantless searches for things. See McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948). The basic theory is that in certain exigent circumstances a search without a search warrant is reasonable under the Fourth Amendment. See Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This theory has also been extended to apply to searches for persons. Warden v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Its application in these circumstances, however, has been limited to holding that a warrant was not necessary prior to entry. It has not, so far as this court can tell, been applied to hold that in certain circumstances the standard for probable cause is reduced. In fact, just the con-

trary seems to be true. In Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970), the court indicates that a higher degree of probable cause is required for police action without the prior approval of the court.

■ Concerning justification for a warrantless search for the dynamite little need be said. The standard is that announced in Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971):

" . . . [T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' "

What are the exigencies that the respondent relies on? No concise list has been offered, but the following circumstances appear to be of concern to the respondent:

1. The murder was a terror bombing of a policeman;

2. There had been previous bombings that summer of police facilities;

3. The police had information that there was some missing dynamite out in the community;

4. The police feared further bombings;

5. The police had been working extremely long hours to solve this murder;

6. The investigation had focused on an organization that advocated violence against police.

This set of circumstances does not fit into any of the exigent circumstances exceptions to the warrant requirement that this court is aware of. There was no hot pursuit, no indication of a bomb about to go off, no cry for help from within, no arrest for a search to be incident to, and this was the search of a home and not an automobile or other readily moveable object. Moreover, the police by their own behavior in taking the time to secure a search warrant state a strong argument for holding that the situation was not so volatile as to require bypassing the magistrate. This is particularly true here where the source of their information concerning the presence of dynamite in David Rice's house was a tip that was given to the police at least three weeks and perhaps as long as two and one-half months prior to the entry of Rice's house. Moreover, the tip itself was not very positive about the dynamite being at Rice's house. At the hearing on the motion to suppress in the state criminal trial, Lt. (then Sergeant) Swanson testified as follows concerning the tip:

"I was told at one time that if there was dynamite in town and if the NCCF had it, that David Rice's house would be one of the places they might store it."

(Transcript, Vol. II, 130: 13–15)

Finally, there is no evidence in the entire record as to the reliability of the informant who gave this tip.

Given this record, this court will not carve out another exception to the warrant requirement. In so refusing, this court is mindful of what the Supreme Court of the United States said in Coolidge v. New Hampshire, supra, after stating that the exceptions to the warrant requirement are to be jealously drawn:

" . . . In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In

times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing everyman's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important."

403 U.S. at 455, 91 S.Ct. at 2032.

Concerning the search for Duane Peak, even less need be said. There is no doubt that it was imperative to find Peak quickly, perhaps for his own safety and certainly to apprehend a dangerous person and to further the investigation of a violent crime suffused with racial hatred. But the necessity here is no greater than it was in Lankford v. Gelston, supra, which intimates no reduction in the standard of probable cause to enter the private home of a third party. The respondent's argument that speed in apprehension was this imperative is weakened by the fact that the police took an hour out from their search for Duane Peak to secure a search warrant for David Rice's house. Finally, it makes little sense, even from the point of view of speed in locating a suspect, to spend police time looking for him at a place where one does not have a reasonable belief that he will be. Thus, on this point also, I find no need to expand the doctrine of exigent circumstances.

▇ Before turning to the last issue still unresolved by this court, a word about one other argument of the respondent is necessary. The respondent argues that this court should take account of the significant public interest involved in apprehending Duane Peak and balance this against the minimal invasion of privacy that took place in searching David Rice's empty house when Rice himself gave permission for anybody to stay in his house. No one can doubt the important public interest in apprehending an accused murderer of

a police officer, but I think the respondent seriously mischaracterizes the interest involved in preventing invasions of privacy by the police. The privacy of one's home and the concomitant ability to decide whom it shall shelter and when is one of the most precious rights we possess as citizens. Entry into the home by police absent probable cause to so enter is precisely what the Fourth Amendment forbids. Apprehension of a dangerous criminal outweighs this interest in the privacy of one's home only if there is probable cause to believe that the criminal is in that home.

Therefore, it is the holding of this court that the police were not rightfully on the premises of David Rice on the night of August 22, 1970, and thus all of the evidence obtained by the search of the house that night was seized in violation of the Fourth Amendment and should not have been received into evidence at the petitioner's criminal trial.

The remaining unresolved issue concerns the introduction into evidence of the dynamite particles found in David Rice's clothing. These particles were obtained from the clothing that the petitioner wore at the time of his arrest. The warrant upon which the petitioner was arrested and arraigned charged him with possession of an explosive substance. It did not charge him with murder or conspiracy to commit murder. (In fact, no murder warrant for his arrest was sworn out until August 31, 1970, the day on which Duane Peak first indicated that the petitioner was involved in the murder.) The petitioner turned himself in to the police when he heard that he was being sought. His clothing was taken from the petitioner as a part of the normal routine at the Douglas County jail for incarcerating persons accused of crime. The clothing was turned over by one of the jailers on August 27, 1970, a few hours after the petitioner surrendered himself, to Special Investigator Richard Curd of the Alcohol, Tobacco & Firearms Division of the Internal Revenue Service, who had participated in the

search of Rice's house. Subsequently the clothing was sent to that Division's national laboratory in Washington, D. C., where the determination was made that certain particles found in the pants pockets were dynamite of the type that was used in the murder of Officer Minard.

The petitioner argues that this evidence should have been suppressed because it was obtained without a search warrant and because it is the "fruit of the poisonous tree." The petitioner's first argument has already been definitively answered by the Supreme Court of the United States in United States v. Edwards, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). In that case the court held that the police are entitled to take the clothing of one validly arrested and subject it to laboratory tests and that those test results are admissible at trial. A search warrant need not be procured in such a situation.

· The petitioner's second argument is of greater merit. His contention that the police would not have come upon the dynamite particles but for the arrest warrant which was issued as a direct result of the illegal search of his home is correct. Thus, the dynamite particles are tainted with the illegality of the search and should also have been suppressed.

The doctrine of the "fruit of the poisonous tree" was first enunciated in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). There the court held that evidence illegally obtained by the police may not be used by the police in any way. Prior to *Silverthorne* the court had held in Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), that such evidence could not be introduced against the defendant at trial. *Silverthorne,* however, contained a limitation on the prohibition of the use of illegally obtained evidence:

" . . . Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, . . ."

251 U.S. at 392, 40 S.Ct. at 183.

This limitation was again stressed in Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), in which the term "fruit of the poisonous tree" was first used. In *Nardone* the Supreme Court acknowledged that:

" . . . Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. . . ."

308 U.S. at 341, 60 S.Ct. at 268.

The germinal opinion for analysis of the doctrine, however, is Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963):

" . . . We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959). . . ."

371 U.S. at 487–488, 83 S.Ct. at 417.

This federally developed principle is applicable to the states. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

 The critical question here is whether the dynamite particles were discovered by means sufficiently distinguishable from the illegal search to be purged of the primary taint. A careful reading of numerous appellate court decisions on what means are sufficiently distinguishable leaves one with the impression that this doctrine is not one of unadulterated clarity. There is very

little law on the subject by the Eighth Circuit Court of Appeals. See Peterson v. United States, 411 F.2d 1074 (C.A. 8th Cir. 1969), and Standard Oil Co. v. State of Iowa, 408 F.2d 1171 (C.A. 8th Cir. 1969). Both cases assert that if the evidence is gained from a source independent of the illegal behavior, the evidence is admissible. In *Peterson*, the evidence was discovered prior to and thus independent of the illegal search and seizure. In *Standard Oil*, the court held that evidence seized illegally could be introduced at a later trial if the evidence was later obtained through authorized discovery proceedings. In so holding it determined at least one acceptable definition of an independent source. Such a source would include information available to the plaintiffs without resort to any clue or knowledge gained from the items unlawfully seized. 408 F.2d at 1177. A reading of these cases together with several others [1] convinces this court that in order to purge the taint of the illegal search it must be shown that the discovery of the evidence was primarily attributable to a source independent of the illegal search. The fact that there was an intervening independent source which was also a "but for" cause of the discovery does not by itself remove the taint of the illegal search, if the illegal search nevertheless formed the primary motivation or basis for the discovery of the evidence.

Before analyzing the evidence in light of this standard one preliminary question must be dealt with: Which party bears the burden of proof that the evidence used is poisoned fruit? Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), and Harrison v. United States, 392 U.S. 219, 224–225, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), make it clear that in a direct criminal appeal the government, once an illegal search has been shown by the defendant, bears the ultimate burden of persuasion that the evidence introduced at trial is free from the illegal taint. It is equally clear that the general rule ·in habeas corpus actions is that the burden of persuasion is on the petitioner. Johnson v. Zerbst, 304 U.S. 458, 468–469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); Hawkins v. Bennett, 423 F.2d 948 (C.A. 8th Cir. 1970). Courts have drawn various exceptions ·to this general rule, however. Naughten v. Cupp, 476 F.2d 845 (C.A. 9th Cir. 1972), reversed on other grounds, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), held that the rule in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), that once the petitioner has established the infringement of a constitutionally protected right, the burden shifts to the state to show that the error was harmless, applied in federal habeas corpus actions. Accord: Bailey v. MacDougall, 392 F.2d 155 (C.A. 4th Cir. 1968). Cooper v. Picard, 428 F.2d 1351 (C.A. 1st Cir. 1970), held that once the petitioner demonstrates that a police station confrontation took place in the absence of counsel, the burden is on the

1. United States v. Owen, 492 F.2d 1100 (C.A. 5th Cir. 1974); United States v. Castellana, 488 F.2d 65 (C.A.5th Cir. 1974); United States v. Resnick, 483 F.2d 354 (C.A.5th Cir. 1973); Gissendanner v. Wainwright, 482 F. 2d 1293 (C.A.5th Cir. 1973); United States v. Miles, 468 F.2d 482 (C.A.3rd Cir. 1972); United States v. Brandon, 467 F.2d 1008 (C.A.9th Cir. 1972); Carpenter v. United States, 463 F.2d 397 (C.A.10th Cir. 1972); United States v. Kennedy, 457 F.2d 63 (C.A. 10th Cir. 1972); United States v. Cassell, 452 F.2d 533 (C.A.7th Cir. 1971); United States v. Fike, 449 F.2d 191 (C.A.5th Cir. 1971); United States v. Jackson, 448 F.2d 963 (C.A.9th Cir. 1971); United States v.

Bacall, 443 F.2d 1050 (C.A.9th Cir. 1971); United States v. Edmons, 432 F.2d 577 (C.A. 2nd Cir. 1970); United States v. Seohnlein, 423 F.2d 1051 (C.A.4th Cir. 1970); Agius v. United States, 413 F.2d 915 (C.A.5th Cir. 1969); Swinney v. United States, 391 F.2d 190 (C.A.5th Cir. 1968); United States v. Ruffin, 389 F.2d 76 (C.A.7th Cir. 1968); United States v. Jackson, 387 F.2d 115 (C.A. 4th Cir. 1967); Green v. United States, 386 F.2d 953 (C.A.10th Cir. 1967); Hancock v. Nelson, 363 F.2d 249 (C.A.1st Cir. 1966); Leek v. State of Maryland, 353 F.2d 526 (C.A.4th Cir. 1965); Wickline v. Slayton, 356 F.Supp. 140 (U.S.D.C.E.D.Va.1973).

state to show that the in-court identification was independent of the tainted lineup. The court thus was applying the rule announced in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), to habeas corpus proceedings. In a footnote in *Wade* the Supreme Court, per Mr. Justice Brennan, adopted the rule espoused by Mr. Justice Murphy in dissent in Goldstein v. United States, 316 U.S. 114, 124, n. 1, 62 S.Ct. 1000, 86 L.Ed. 1312 (1942), that:

> "[A]fter an accused sustains the initial burden, imposed by Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, of proving to the satisfaction of the trial judge in the preliminary hearing that wire-tapping was unlawfully employed, as petitioners did here, it is only fair that the burden should then shift to the Government to convince the trial judge that its proof had an independent origin."

388 U.S. at 240, 87 S.Ct. at 1939. Mr. Justice Murphy in *Goldstein* cogently set forth the rationale for such a shift in the burden of proof by quoting from the opinion of the Circuit Court of Appeals:

> " ' . . . this should be the rule in analogy to the well settled doctrine in civil cases that a wrongdoer who has mingled the consequences of lawful and unlawful conduct, has the burden of disentangling them and must bear the prejudice of his failure to do so; that is, that it is unfair to throw upon the innocent party the duty of unravelling the skein which the guilty party has snarled. To impose the duty upon the prosecution is particularly appropriate here, for it necessarily has full knowledge of just how its case has been prepared; given a prima facie case against it, i. e., "taps" and some use of them, it should do the rest.' 120 F.2d 485, 488."

316 U.S. at 124, 62 S.Ct. at 1005.

Absent controlling authority to the contrary from the Eighth Circuit Court of Appeals, I think that the position taken by the First Circuit in *Cooper* is correct, since the knowledge of whether the evidence was discovered by means of an independent source is peculiarly the prosecution's. Thus once the petitioner has shown that there was an illegal search which was a "but for" cause of the discovery of the evidence sought to be suppressed, the burden is on the respondent to show that the evidence was obtained by a source independent of the illegal search.[2]

█ The evidence before this court shows that the only basis for the arrest of the petitioner at the time he turned himself in was formed by the evidence discovered in the illegal search of his home. The only piece of evidence additional to the list of fifteeen facts noted above that the police learned after the search and before the petitioner's arrest was that Duane Peak and David Rice had a protracted conversation in front of the NCCF headquarters on the afternoon preceding the bombing. This fact and the facts known to the police before the search do not amount to probable cause to arrest the petitioner, since they would not war-

---

2. This court is aware that Gissendanner v. Wainwright, 482 F.2d 1293 (C.A.5th Cir. 1973), contains language which places the burden on the petitioner to show that it was solely through an invalid source that his identity was ascertained. This case is distinguishable, however, because the poisoned fruit which the petitioners sought to take from the government was not a piece of evidence but their very identity as the alleged perpetrators of the crime. As Chief Judge Brown correctly noted, the thrust of *Wong Sun* and *Silverthorne* is basically a rule of evidence prohibiting the introduction of certain evidence. Identity as alleged perpetrators is not itself a piece of evidence where, as in *Gissendanner*, the tainted source identifying the petitioners was not introduced into evidence. The only use of the tainted evidence in *Gissendanner* was that it initially fingered the petitioners. Such is not the case here. The dynamite particles were evidence and they were introduced into evidence. Thus they fall within the thrust of *Wong Sun* and *Silverthorne*.

rant a man of reasonable caution to believe that the petitioner had either murdered or conspired to murder Officer Minard. Thus, the illegal search was clearly a "but for" cause of the arrest warrant for the petitioner.

The evidence also shows that the issuance of the arrest warrant was the "but for" cause of the petitioner's surrendering himself for arrest. The substantial remaining question is whether the petitioner's surrendering himself as he did is an independent source primarily responsible for the discovery of the dynamite particles. I am convinced that it is not, because the petitioner would not have done what he did were it not for the illegal search conducted by the police. See Harrison v. United States, supra. In that case the Supreme Court held that the petitioner's choice to take the stand to rebut the illegal introduction of statements obtained from him did not make that testimony on the stand an independent source purged of the illegality of the use of the statements. The government did not show that its illegal behavior did not impel the petitioner to take the stand and thus his testimony was tainted by the government's illegal behavior, since there was no showing that it was truly independent of the misconduct. Here, also, there is no showing by the respondent that the surrendering for arrest was not impelled by the illegal search. The record, in fact, affirmatively shows that the invalid arrest warrant (since based substantially on the illegal search) was what in fact induced the surrender for arrest. The fact that the petitioner turned himself in for arrest does not provide an independent source for the introduction of the dynamite particles.

■ There is however, a further act of the petitioner which must be examined. Had the petitioner not chosen to wear the pants he did on the day he decided to turn himself in, the dynamite particles in question would not have been found. Is this act sufficient to break the causal chain between the

illegal search and the discovery of the dynamite particles? The resolution of this question is not without difficulty, but this court is convinced that the respondent has not met its burden of proof on this point. The record reveals that the petitioner's clothes were taken from the jail clothing room within a few hours of his arrest by a special investigator of the Alcohol, Tobacco & Firearms Division of the Internal Revenue Service who had participated in the illegal search, for the purpose of being sent to that Division's crime laboratory for analysis. It also shows that up to the time of the seizure of the clothing the only substantial evidence linking the petitioner to the homicide was that discovered in the illegal search. The record also shows that it was routine procedure to place the clothes of a jail prisoner in safekeeping. It does not reveal, however, that it was routine procedure to send all clothing to a crime laboratory for analysis. The most reasonable inference from the record before this court is that the clothing was sent to the crime laboratory for analysis because of the suspicions engendered by the illegal search. Such conduct amounts to obtaining the evidence by an exploitation of the illegal search. It is just such conduct that *Wong Sun* condemns. Thus, here, too, there is no independent source for the introduction of this evidence.

This court is aware of the decision in Hancock v. Nelson, 363 F.2d 249 (C.A. 1st Cir. 1966), which held that since the illegal detention in the case before it had nothing to do with the presence of blood on the clothing taken from the defendant at the jail after his arrest, the clothing was admissible and not the fruit of the poisonous tree. A strong dissent by Chief Judge Aldrich viewed this position as clearly an erroneous statement of the law. I am of the opinion that Judge Aldrich was correct.

Nor is this case at all similar to Agius v. United States, 413 F.2d 915 (C.A. 5th Cir. 1969). In that case the

defendant was improperly stopped and questioned by the police about a robbery. During the course of the questioning the defendant voluntarily went to his car to find a receipt that would give the address of a person who could support his alibi. While searching for the receipt, the defendant inadvertently exposed to the view of the officers a toy gun which was later introduced into evidence at his trial. The court held that such an admission was not erroneous since the defendant's voluntary act broke the chain between the illegal action and the discovery of the evidence. No such break is present in the case before me, because it was the illegal search, rather than any voluntary act of the petitioner, that prompted the taking of the petitioner's clothes for laboratory analysis.

Thus, it is clear that the discovery of the dynamite particles is not attributable to any source independent of the illegal search. From what has been said above it is also clear that the connection between the illegal search and the discovery of the evidence is not attenuated in the sense discussed in Nardone v. United States, supra. The causal relationship is direct and proximate between the illegal search and the petitioner's surrender for arrest and between the illegal search and the seizure of the petitioner's clothing by the Alcohol, Tobacco & Firearms Division investigator, who also had participated in the illegal search.

Some lower federal courts have developed a further limitation on the doctrine. If the evidence which was in fact discovered only through the illegal behavior inevitably would have been discovered by legitimate means, the evidence is admissible at trial. Gissendanner v. Wainwright, 482 F.2d 1293 (C.A. 5th Cir. 1973); United States v. Seohnlein, 423 F.2d 1051 (C.A. 4th Cir. 1970). Other courts have refused to accept this limitation. United States v. Castellana, 488 F.2d 65 (C.A. 5th Cir. 1974). Whatever the merits of this limitation, it

has no application to this case. Even if it were inevitable that the petitioner would have been arrested without the illegal search, it was not inevitable that when arrested he would have been wearing the clothing which contained the dynamite particles. It was not inevitable, therefore, that the dynamite particles would have been discovered absent the illegal search.

Finally, there is some law to the effect that evidence that is indirectly discovered because of illegal police behavior should be admissible unless suppression of such evidence serves a deterrent purpose. United States v. Kennedy, 457 F.2d 63 (C.A. 10th Cir. 1972); Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) (dissenting opinion of Justice White). I do not find this to be the law at this time, but even if it were, I find that suppression in this case would serve a deterrent purpose, since the relationship between the illegality and the evidence discovered is so direct that it would be reasonable to infer that the police could conduct an illegal search in order to secure the arrest of a person whose clothing and fingernails they wanted to examine. I am not saying that this was the motivation in this case. In fact, the evidence gives no indication that this played any conscious part in the decision to enter the petitioner's premises. In order to show that excluding evidence of this type would have some deterrent effect on illegal searches it is sufficient to find that one could reasonably foresee that the police could engage in an illegal search in order to discover evidence on the person or his clothing when arrested.

Therefore, it is the holding of this court that the dynamite particles should have been suppressed since they were fruit of the illegal search.

Since it is clear that the introduction of the evidence seized in the illegal search and the dynamite particles substantially contributed to the petitioner's conviction, that introduction was

not harmless error. Therefore, the petitioner must either be released from custody or granted a new trial free from the tainted evidence.

An appropriate order will be entered as of this date so directing.