**ITT COMMUNITY DEVELOPMENT CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**John BARTON, a/k/a John A. Barton, and Joan Barton, his wife, Defendants.**

**No. 76–370–Orlando–Civil–Y.**

United States District Court, M. D. Florida, Orlando Division.

Aug. 18, 1978.

As Amended Sept. 5, 1978.

Mark Hicks, Daniels & Hicks, Miami, Fla., Bradford, Williams, McKay, Kimbrell, Hamman & Jennings, P.A., Miami, Fla., for plaintiff.

Dan R. Warren, Daytona Beach, Fla., for defendants.

## FINDINGS OF FACT AND MEMORANDUM OPINION

GEORGE C. YOUNG, Chief Judge.

This cause is before the Court on the motion of the defendants John and Joan Barton to dissolve the order of the Court entered on September 22, 1977. The defendants also moved ore tenus at a hearing before the Court on June 7, 1978 to dissolve a writ of attachment on defendants' real property on the ground that the Florida attachment statute, Section 76.01 *et seq.,* Florida Statutes, is unconstitutional. Plaintiff filed a cross motion ore tenus to enjoin the defendants from any conveyance of the real property in question, pending the outcome of this law suit.

The issues now before the Court involve the same subject matter addressed by the Court in its September 22, 1977 order. That order is being reconsidered in light of the decision in *ITT Community Development Corporation v. Barton,* 569 F.2d 1351 (5th Cir. 1978), rendered by the Court of Appeals for the Fifth Circuit on March 24, 1978.

### I.

### PROCEDURAL POSTURE OF THE CASE

The progress of this case is becoming increasingly complex. The Fifth Circuit's *Barton* opinion was rendered on an interlocutory appeal from a contempt order entered by Judge William O. Mehrtens. Judge Mehrtens' contempt order was entered while this case was pending in the U.S. District Court for the Southern District of Florida, after its removal from the Circuit Court for Dade County, Florida. The case was later transferred to this court in September 1976.

Subsequent to the transfer, the defendants requested that the Court hear their motions to dissolve certain prejudgment writs of garnishment and a writ of attachment. The motions were initially filed while the case was before Judge Mehrtens. The writs of garnishment had been issued by the Clerk of the Circuit Court of Dade

County, Florida in March 1975, prior to removal of the case to the federal court. The writ of attachment was issued by the Clerk of the U.S. District Court for the Southern District of Florida on April 18, 1975. Judge Mehrtens never dissolved the writs, and once the case was transferred to this Court the defendants renewed their motions to dissolve the writs. The motions were noticed for hearing before this Court on April 12, 1977.

At the April 12th hearing the Court listened to the arguments of defendants' counsel with regard to the constitutionality of the Florida prejudgment garnishment statute, Chapter 77, Florida Statutes. For reasons unknown to the Court, however, the matter of the writ of attachment was never considered. In accordance with the ruling made from the bench, the Court entered its written order on September 22, 1977. This Court held the Florida prejudgment garnishment statute to be unconstitutional and the writs of garnishment were dissolved. At the same time, the Court enjoined transfer of the bank funds that had been garnished. Because the real property subject to the writ of attachment was never considered, the lien imposed by the attachment presumably remains in force. For this reason, at the June 7, 1978 hearing on the defendants' motion to dissolve the Court's September 22, 1977 order, the defendants again directed the Court's attention to the writ of attachment against their real property.

In turn, the plaintiff sought to have transfer of the real property enjoined in the same manner as were the bank accounts under the September 22, 1977 order. The plaintiff has not attempted to argue in support of the validity of the attachment statute. Instead, the plaintiff seeks an injunction under the same theory of constructive trust as that relied upon for enjoining transfer of the bank funds.

## II.

### CONSTITUTIONALITY OF THE WRIT OF ATTACHMENT

■ The Court will first consider the constitutionality of the Florida statute which permitted the plaintiff to obtain a prejudgment writ of attachment against the defendants' real property. Looking to state law, the Court finds that on September 23, 1976, in the case of *Unique Caterers, Inc. v. Rudy's Farm Company,* 338 So.2d 1067 (Fla. 1976), the Florida Supreme Court held that Chapter 76, Florida Statutes, to the extent it provides for attachment prior to judgment, violates the Due Process Clause and is unconstitutional. Reference to this case concludes the Court's inquiry. The prejudgment writ of attachment against defendants' real property is invalid and has been so for nearly two years. The writ will be dissolved by the Court.

Having dissolved the writ of attachment, the Court must next proceed to the question of whether a constructive trust should be imposed, and if so, whether transfer of the defendants' real property should be preliminarily enjoined pending the outcome of this action. Resolution of this question requires consideration of the likelihood of plaintiff being successful on the merits of its claims against the defendants.

## III.

### PLAINTIFF'S LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff has asked the Court to impose a constructive trust *pendente lite* upon those funds described in the September 22, 1977 order, except for the childrens' trust funds. The childrens' trust funds, held in accounts at the Barnett Bank of Ormond Beach, were released by written order entered on June 12, 1978. The injunction of September 22, 1977 therefore no longer prohibits transfer of funds in the childrens' trust accounts. With respect to the remaining funds and the defendants' real property, during the hearing on June 7, 1978 the Court ordered counsel to submit briefs along with citations to any testimony at prior hearings or discovery depositions in this case. Based on these briefs and the accompanying excerpts from recorded testi-

mony, the Court now makes findings of fact to supplement the findings contained in its September 22, 1977 order.

The findings made herein are preliminary only. They are being made solely for the limited purpose of determining whether the Court's preliminary injunction should be continued in effect. Different findings as to particular facts may ultimately be made at the conclusion of the case once there has been a complete presentation of evidence and arguments of counsel at trial.

## A.

## FINDINGS OF FACT

The defendant John Barton was first employed by the plaintiff, ITT Community Development Corporation, as Chief Engineer at the plaintiff's Palm Coast land development project in Flagler County, Florida, beginning in 1969. The defendant[1] continued his employment with the plaintiff in various supervisory capacities through the fall of 1974. Initially, the defendant was paid a salary of $18,000.00 per annum for his full-time employment with the plaintiff. Each year the defendant got a raise of several thousand dollars so that in the year 1973 the defendant's income tax return indicates income from wages of approximately $32,000.00 for his services to the plaintiff.

During this time period, from 1971 through 1974, the defendant also received substantial outside income. His tax returns indicate that he made $27,828.00, $72,434.00, and $70,382.00 from outside consulting work during the years 1971, 1972, and 1973, respectively. Testimony of the contractors in this case and evidence in the form of their cancelled checks to the defendant indicates that the actual sums paid by them to the defendant were substantially greater. Halifax Paving, through its president, Leonard Durrance, Lowery Brothers, Inc., through its president, C. D. Lowery, and the various Mange construction companies through Joe Mange, Sr. paid the defendant

money in the amount of three percent (3%) of their gross receipts from contracts with the plaintiff. All three of these contractors were doing work for the plaintiff on the Palm Coast project. The various payments to the defendant total about $350,000.00 during the period 1970 to 1975.

The defendant contends that these payments were received for engineering consulting work done by him for the contractors. The defendant claims he was merely moonlighting. No records were kept, however, either by the defendant or the contractors, that could indicate exactly what work the defendant did and what it entailed.

Leonard Durrance of Halifax Paving has testified that he initially agreed to pay the defendant at the rate of $15.00 per hour for some consulting work. When the defendant had built up several hours time and was due to be paid, a disagreement occurred between Durrance and the defendant as to the number of hours actually worked. At that time the defendant suggested to Durrance that, in order to make it easier and simpler, the defendant should be paid at the rate of 3% of all the monies received by Halifax Paving on account of work done for the plaintiff.

The defendant sent no invoices to the contractors for his alleged consulting work. The contractors delivered their checks personally to the defendant, who then deposited each of these checks in accounts held by his wife and him at Century Federal Savings and Loan Association of Ormond Beach and the Barnett Bank at Ormond Beach. In contrast, the defendant always put his salary paychecks from the plaintiff in the Citizens Bank of Bunnell. None of the contractors' payments were deposited in the Bunnell bank. The defendant explained this procedure, during his deposition on August 2, 1975, at page 114, by stating:

"I never liked to have more than three or four thousand dollars in that bank, frankly, because I know, as a matter of

1. All future references herein to "the defendant" refer to John Barton and not to Joan Barton, his wife and co-defendant. References to "the defendants" refer to both John and Joan Barton.

fact, they talk about your business in the Bunnell Restaurant."

Testimony of the contractors and their employees further supports the evidence that the 3% payments to the defendant were to remain secret and were not supposed to be discussed or talked about in the presence of others. The defendant denied receipt of any payments whatsoever when he was first confronted by Elias Pritchard, the plaintiff's Vice-President for Operations. Pritchard questioned the defendant about accusations that the defendant had been receiving the 3% payments outside his salary, either from moonlighting or otherwise. The defendant initially claimed to have received nothing.

The plaintiff corporation had in effect a policy forbidding outside work by its employees, absent prior permission from the corporation. The defendant signed a receipt in June 1973 acknowledging that he had been given a copy of this policy. This was during the time he was receiving the 3% payments from the contractors. Until the fall of 1974 the plaintiff corporation was unaware of the defendant's receipt of the outside payments.

The defendant has been unable to produce any physical evidence, such as drawings, calculations, blueprints signed by him, or other materials which could substantiate his claim that he was moonlighting rather than receiving kickbacks. The defendant, when questioned by Judge Mehrtens during a previous hearing in this case, was unable to provide any explanation as to why he was paid by the contractors on the basis of the dollar amount of their gross receipts from the plaintiff for work done by them, rather than on the basis of the amount of work allegedly done by the defendant for them.

The evidence developed through discovery in this case points to only one conclusion. The defendant John Barton was receiving improper payments from contractors doing business with his employer, the plaintiff. These payments far exceeded the salary received by the defendant as a full-time, professional engineer employed by the plaintiff. The defendant, as an employee of the plaintiff, exercised significant control over the work being done on plaintiff's Palm Coast project. Much of this work was being done by the very contractors from whom the defendant was concurrently receiving the 3% payments.

The evidence further indicates, and the Court so finds for purposes of the motions now under consideration, that the defendant, by his own admission, deposited these wrongful payments exclusively in the bank accounts which are the subject matter of the Court's September 22, 1977 order. With respect to the real property that is subject to the writ of attachment, however, the evidence is less clear.

The $2,000 down payment on the real property was made by means of a check drawn on defendants' checking account at the Barnett Bank of Ormond Beach. As previously found herein, the funds on deposit at that bank were there as a result of the wrongful payments made by the contractors to the defendant. There is no evidence as to the total value of the real property, of which the down payment represents only a portion. Neither is there evidence that any payments, other than the down payment, can arguably be traced to a source of funds wrongfully received by the defendant from the contractors.

The Court finds therefore that insufficient evidence exists to demonstrate that the real property in question was acquired with proceeds of the contractors' 3% payments to the defendant. Accordingly, the defendants cannot be enjoined from alienating, encumbering, or otherwise transferring the real property previously subject to the prejudgment writ of attachment that has been dissolved herein by this Court. The remainder of this opinion will refer only to the defendants' bank accounts and not to their real property.

B.

PLAINTIFF'S RIGHT TO RECOVER UNDER COUNT SEVEN OF THE AMENDED COMPLAINT

Because this case is before the Court solely on the basis of diversity jurisdiction, pur-

suant to 28 U.S.C. § 1332, the substantive law which controls is the law of the State of Florida. The plaintiff has alleged in Count Seven of its amended complaint, filed on July 30, 1975, that it is entitled to imposition of a constructive trust on all funds that can be demonstrated to be proceeds of wrongful payments by the three contractors to the defendant. The plaintiff has alleged it has a right under Florida law to secure a preliminary injunction prohibiting transfer of these funds *pendente lite.*

■ Looking to the Florida law, the Court finds that in the case of *Connelly v. Special Road and Bridge District No. 5,* 99 Fla. 456, 126 So. 794 (1930), the Supreme Court of Florida held that an employee is bound to the exercise of good faith toward his employer. The employee cannot, without the employer's consent, retain profits on earnings received in the course of performance of the employer's business or in an undertaking which conflicts with the employee's duties to his employer. Such profits belong to the employer.

■ The Florida Supreme Court has also stated that equity will raise a constructive trust and compel restoration where one, through actual fraud, abuse of confidence reposed and accepted, or through other questionable means, gains something for himself which in equity and good conscience he should not be permitted to hold. *Quinn v. Phipps,* 93 Fla. 805, 113 So. 419 (1927).

■ As this Court's findings herein indicate, the 3% payments received by the defendant from the contractors can, at best, be described as having been acquired by questionable means. Receipt of the payments clearly conflicted with the defendant's duty to the plaintiff as an employee. The 3% payments may be characterized as a secret profit realized by the defendant from circumstances arising out of his employment. An employer may recover all secret profits by a suit in equity. *See Martin Company v. Commercial Chemists, Inc.,* 213 So.2d 477 (4th D.C.A. Fla.1968).

If the plaintiff prevails—as seems likely—the funds received from the contractors should not be retained by the defendants as they are the equitable property of the plaintiff under Florida law and may be recovered by means of a constructive trust and accounting, as prayed for in Count Seven of the plaintiff's amended complaint.

### C.

### DEFENDANTS' AFFIRMATIVE DEFENSES

The defendants have argued that the plaintiff is not likely to prevail on its suit for imposition of a constructive trust because of the affirmative defenses raised by the defendants. In addition, the defendants allege they have various claims against the plaintiff for damages. These claims are alleged to exceed the funds in the defendants' bank accounts which are subject to the Court's injunction.

■ Any causes of action the defendants may or may not have against the plaintiff are not relevant to the issue of the plaintiff's entitlement to equitable recovery of the 3% payments. Equity jurisprudence provides that the funds properly belong to the plaintiff, not the defendants. The defendants are therefore not entitled to use of the funds pending final determination of this case. Equity deems the funds to be the property of the plaintiff, recoverable by means of a constructive trust. The funds are not damages.

The Court has only imposed a trust; it has not ordered turnover of the funds for the plaintiff''s use during the pendency of this action. For example, if the defendant happens to prevail on his claim against the plaintiff for indemnity of losses suffered as a result of the defendant's improper certification of certain land development plats for the plaintiff, then a final accounting will be necessary. The defendant might ultimately recover more from the plaintiff than the amount of money held in trust. Accounting at that time would then be proper.

All the affirmative defenses pled by the defendants in paragraphs 12(a) and 12(b) of their answer to the amended complaint are irrelevant to the question of the defend-

ant's breach of his duty as an employee of the plaintiff. The defendants have alleged the plaintiff comes before the Court with unclean hands. In support of this allegation the defendants have raised questions regarding the social, political, and environmental propriety of the plaintiff's Palm Coast project. These issues do not concern the plaintiff's treatment of the defendant in its role as his employer. Moreover, in breaching his duty to the plaintiff, the defendant simply sought to enrich himself rather than to vindicate any interest on the part of the public in seeing that the Palm Coast project was built properly.

■ The defendants' own citation of authority reveals that the unclean hands doctrine applies only when there has been inequitableness or bad faith relative to the matter in which relief is sought. *See Precision Instrument Manufacturing Company v. Automotive Maintenance Machinery Company,* 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

The remaining allegations regarding defenses in the defendants' answer allege that the plaintiff has withheld pension benefits due the defendant and has attempted to make the defendant a scapegoat for alleged wrongs committed by the plaintiff. The defendants allege in paragraph 12(c) of their answer that the plaintiff's use of the prejudgment garnishment writs was "an effort to drive them to the wall by depriving them of the means of defending themselves in this action and of paying living costs during the litigation." The plaintiff's actions in procuring and enforcing the prejudgment writs are characterized by the defendants as further evidence of the plaintiff's unclean hands.

■ All of the alleged "unclean" actions on the part of the plaintiff took place *after* its discovery of the defendant's wrongdoing. These actions, although certainly adverse to the interest of the defendants, were not legally unfair and oppressive; nor were they equitably unconscionable. The plaintiff's course of action subsequent to discovery of the defendant's infidelity appears to be a vigorous, yet legitimate effort to recover for the alleged wrongs of the defendant. The Court finds the plaintiff's actions are not tainted with such bad faith as to warrant application of the unclean hands doctrine. The Court finds that the affirmative defenses raised by the defendants are not likely to bar recovery by the plaintiff on Count Seven of its amended complaint. Plaintiff is therefore likely to prevail against the defendants on Count Seven.

## IV.

### AUTHORITY OF THE COURT TO ENTER A PRELIMINARY INJUNCTION

Having found that the plaintiff is likely to prevail on the merits of Count Seven, thereby entitling it to imposition of a constructive trust on the funds in defendants' bank accounts, the Court must next decide whether a preliminary injunction is necessary and proper to disposition of this case. The defendants argue that the decision rendered by the Fifth Circuit in *ITT Community Development Corporation v. Barton,* 569 F.2d 1351 (5th Cir. 1978) precludes any prejudgment restrictions on transfer of funds in the defendants' accounts. The Court must give careful consideration to the *Barton* decision before ordering that its September 22, 1977 injunction remain in effect.

In *ITT Community Development Corporation v. Barton* the Fifth Circuit did not consider the plaintiff's theory of imposition of a constructive trust pursuant to Florida law. In footnote 13 of its opinion, the Court of Appeals noted that the plaintiff amended its complaint on July 30, 1975 to include the seventh count seeking equitable relief in the form of a constructive trust. The Court of Appeals in looking to the substantive law of Florida reviewed only the prejudgment garnishment statutes, not Florida equity jurisprudence. The district court's contempt order under review was found to have exceeded judicial authority under the garnishment statute, even if the statute were held to be constitutional. 569 F.2d at 1357 n. 14.

After consideration of Florida's prejudgment garnishment procedures, the Fifth Circuit turned its attention in *Barton* to the All Writs Act and the inherent powers doctrine, neither of which were found to support the district court's contempt order. The All Writs Act provides a federal court with those writs necessary to the preservation or exercise of its subject matter jurisdiction. 569 F.2d at 1359. Power under the All Writs Act is limited to that necessary to facilitate a federal court's effort to manage a case to judgment.

Arguably, unless the Court enjoins transfer of the funds in this case they may be dissipated and entry of an effective final judgment imposing a constructive trust would be impossible in that event. But the Court prefers not to rest its authority to grant preliminary relief in this case on the All Writs Act alone. The inherent powers doctrine provides justification as well.

The breadth of the inherent powers doctrine, as outlined by the Fifth Circuit in *Barton,* depends on the exigencies of the pending litigation. The inherent powers doctrine insures that a federal court, sitting in equity, possesses all the common law equity tools of a chancery court (subject only to congressional limitation) to process litigation to a just and equitable conclusion. 569 F.2d at 1359.

One such tool is the equitable authority to sequester and enjoin transfer of a trust res pending outcome of a suit involving a constructive trust. *See Krusen Land and Timber Company v. Tampa Suburban Corporation,* 118 Fla. 173, 158 So. 712 (1935). The Fifth Circuit did not consider use of this tool in its *Barton* decision because the original complaint sought only a money judgment. 569 F.2d at 1360 n. 21.

The Fifth Circuit held that the district court's order directing the defendants and their attorneys to turn over the proceeds of two cashier's checks or be adjudged in contempt was inappropriate because the prospect of a final judgment in the plaintiff's favor was somewhat remote. This, along with other facts and circumstances in the case, did not justify an exercise of equitable relief. In support of its holding the Fifth Circuit relied heavily on the Supreme Court decision in *DeBeers Consolidated Mines, Ltd. v. United States,* 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566 (1945).

The plaintiff's prospect of getting a final judgment in its favor was considered remote by the Fifth Circuit in *Barton* because of three contingencies. In order to prevail, the Fifth Circuit noted that the plaintiff would have had to get a favorable judgment on some count in the original complaint that could be characterized as a debt. The Court of Appeals expressly noted that the claims alleged in the amended complaint were not being considered by it, because the writs of garnishment were issued prior to the amendment, pursuant to the original complaint. Second, the Florida prejudgment garnishment statute would have to pass constitutional muster. Finally, the Fifth Circuit noted that the plaintiff would have to prove that the debt to be recovered from the defendants was not contingent and that none of the defendants' defenses entitled them to a setoff. 569 F.2d at 1360.

The Fifth Circuit also noted that the district court failed to make findings of fact and conclusions of law. Neither did the district court consider the propriety of having the plaintiff post a bond to protect the defendants in the event the preliminary turnover order proved erroneous.

In light of those circumstances, the Fifth Circuit read *DeBeers* to require reversal of the district court's contempt order. The posture of the case at bar has changed dramatically, however, during the years that have followed Judge Mehrtens' contempt order which was the subject of the *Barton* decision. An application of *DeBeers* today produces a wholly different result from that reached by the Fifth Circuit in *Barton.*

Although the Fifth Circuit quoted extensively from the Supreme Court's language in *DeBeers,* the facts of that case were not directly discussed. In *DeBeers* the Supreme Court considered the propriety of a

prejudgment sequestration order imposed on funds present in the United States which were the property of the foreign diamond distributor defendants. The complaint of the United States government sought injunctive relief under the Sherman Act to restrain future monopolistic conduct on the part of the defendants. The money which was the subject of the district court's injunction was therefore not directly at issue in the case. The money was of concern to the plaintiff United States for a limited purpose only. Need for the money was based on several contingencies, the likelihood of which was unknown. The money might be a source from which to draw fines that might be imposed upon the foreign defendants for disobedience of a final injunction that might be entered by the court. The government hypothesized that if the defendants' assets were withdrawn from the United States prior to a final judgment in the case, then it would be difficult for the Court to enforce an injunction by means of fines against the foreign corporations.

Although the Supreme Court found on the facts before it in *DeBeers* that a preliminary injunction was improvidently entered, it was careful to distinguish those facts from other cases. Writing for the Court, Mr. Justice Roberts stated:

> "A preliminary injunction is always appropriate to grant intermediate relief of the same character as that which may be granted finally. The injunction in question is not of this character. . . .
>
> . . . The respondent [United States] refers us to certain cases as analogous but, upon examination, they are all found to be cases in which an interlocutory injunction was granted with respect to a fund or property which would have been the subject of the provisions of any final decree in the cause, or against action which would ultimately have been subject to injunction by final decree." (References to footnotes omitted.)

Footnote reference was made to *Deckert v. Independence Shares Corporation,* 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940) as such an analogous case. 325 U.S. at 220 n. 11, 65 S.Ct. at 1134.

In *Deckert* the Supreme Court approved an order by a district court that had preliminarily enjoined transfer of funds held by a defendant, the Pennsylvania Company for Insurances on Lives and Granting Annuities. The plaintiffs' complaint sought rescission of their purchases of contract certificates from a predecessor of the defendant Independence Shares Corporation. The plaintiffs alleged fraud in the sale of the contract certificates and sought restitution of monies paid by them to the defendants.

The Supreme Court reversed the Court of Appeals for the Third Circuit in *Deckert* and upheld the district court's injunction as a reasonable measure to preserve the status quo pending final determination of the case. Equitable relief was sought in the complaint and there were allegations that the defendant Independence was insolvent, that its business was halted, and that its remaining assets were in danger because of creditor suits. The defendant Pennsylvania was enjoined from transferring the assets because, although the contracts were purchased by the plaintiffs from Independence, the plaintiffs' subsequent installment payments on the contracts were made to Pennsylvania pursuant to a complicated arrangement between the two corporate defendants. 311 U.S. at 288–89, 61 S.Ct. 229.

## V.

### THE PROPRIETY OF A PRELIMINARY INJUNCTION IN THIS CASE

■ Returning to the facts of the case at bar, the Court finds them to be on all fours with the facts of *Deckert*. The plaintiff is seeking equitable relief. The Court has found a likelihood that the plaintiff will prevail on the merits of Count Seven of its amended complaint. The defendants' funds will likely be dissipated before the conclusion of this case unless injunctive relief is granted. If the funds are dissipated, then the plaintiff's legal remedies will prove inadequate and no res will exist upon which the Court may impose a constructive trust. Irreparable harm will therefore result if

transfer of the funds is not preliminarily enjoined.

The Court has required the plaintiff to post a bond in the amount of Two Hundred Fifty Thousand Dollars ($250,000.00). The plaintiff has posted the bond in a form satisfactory to defense counsel. Given the facts of this case as found herein, together with the security of the bond, the Court finds there is not a significant potential of harm to the defendants, or others, arising out of the Court's issuance of a preliminary injunction.

The public interest, if cognizable at all in this case, appears to lie in favor of the plaintiff. Unless use of the funds is enjoined, an unfaithful employee may be permitted to expend his ill-gotten profits in an attempt to defend his wrongful actions. Such a result is not in the public interest.

The Court, after consideration of the facts in this case, of its authority to issue a preliminary injunction, and of the factors that must be weighed in deciding the propriety of issuing a preliminary injunction, finds that its order entered on September 22, 1977, as modified by its order of June 12, 1978, should be continued in effect in this case pending entry of a final judgment on Count Seven of the plaintiff's amended complaint. A separate order shall be entered in accordance herewith.