**SMALL BUSINESS ADMINISTRATION,**
Plaintiff,

v.

**Guido ECHEVARRIA, Sr.
et al., Defendants.**

No. 91–0033–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 9, 1994.

Jeffrey Roth, Jeffrey Roth P.A., Coral Gables, FL, Arlene P. Messinger, Small Business Admin., Office of Litigation, Washington, DC, for plaintiff.

Richard Siegmeister, Miami, FL, for Guido Echevarria, Sr. and Maria Echevarria.

Gary Brookmyer, Miami, FL, for Alexander Echevarria and Maria Echevarria.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

K. MICHAEL MOORE, District Judge.

THIS CAUSE came before the Court for a non-jury trial on Plaintiff Small Business Administration's claim for damages arising out of the Defendants' management of a Small Business Investment Company in contravention of Small Business Administration rules and regulations. Having considered all the evidence, including the testimony of the witnesses, and being otherwise duly advised, the Court enters its Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

This is an action by the Small Business Administration ("SBA"), as Receiver for Trans Florida Capital Corporation ("Trans Florida") to recover damages from former principals of Trans Florida, Guido Echevarria, Sr., ("Guido"), Mercedes Echevarria ("Mercedes") and Alexander Echevarria ("Alexander"). Guido and Mercedes are married and are the parents of Alexander. The suit also seeks damages from Alexander's wife, Maria Teresita ("Maite") Echevarria, ("Maite"). The complaint alleges that Defendants violated regulations governing Licensees under the Small Business Investment Act of 1958 as amended, 15 U.S.C. § 671 *et seq.,* ("SBIA") by using Trans Florida to make loans to entities in which they held ownership interests.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 754 because this matter is ancillary to a receivership proceeding pending in this Court under case number 88–0299–CIV–KEHOE. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1345 because it has been commenced by the Plaintiff, an agency of the United States, which has authority to sue pursuant to 28 U.S.C. §. 754.

Trans Florida was a Small Business Investment Company ("SBIC") licensed under the Act. As such, it engaged primarily in lending money to minority-owned businesses that could not otherwise obtain financing. The money it loaned consisted of private capital and matching funds from the SBA. The Plaintiffs filed their 27–count complaint on January 7, 1991, alleging claims for conversion, common law theft and breach of fiduciary duty, under Florida law, and federal civil RICO, pursuant to 18 U.S.C. §§ 1962, 1963, 1964, *et seq.*

Pursuant to Fed.R.Civ.P. 41(a)(1), the Plaintiffs voluntarily dismissed without prejudice all counts against the Defendants with the exception of the following: (1) Count I for conversion as to Defendants Guido Echevarria, Sr., Alexander Echevarria and Mercedes Echevarria; (2) Count VI for conversion as to Defendant Guido Echevarria, Sr.; (3) Count XI for conversion as to Defendant Guido Echevarria, Sr.; (4) Count XII for civil theft as to Defendant Guido Echevarria, Sr., Alexander Echevarria and Mercedes Echevarria; Count XXII for civil theft as to Guido Echevarria, Sr. (6) Count XXIII seeking the imposition of a constructive trust against Defendants Guido Echevarria, Sr., Alexander Echevarria and Maite Echevarria; (7) Count XXIV for foreclosure on an equitable lien against Defendants Alexander Echevarria and Maite Echevarria; (8) Count XXV for breach of fiduciary duty as to Guido Echevarria, Sr., Alexander and Mercedes Echevarria; (9) Count XXVI for an accounting as to Guido Echevarria, Sr., Alexander and Mercedes Echevarria; (1) Count XXVII for federal and state civil RICO violations as to Guido Echevarria, Sr., Alexander Echevarria and Mercedes Echevarria.

The Court denied the Defendants Alexander and Maite Echevarria's Motion for Partial Summary Judgment on the following counts: I, II, XII, XIII, XXIII, XXIV, XXV and XXVII (DE # 132) on April 20, 1994 (DE # 154). In the same Order, the Court also denied the Plaintiff's Cross–Motion for Partial Summary Judgment on counts I, XII, XXIII, XXIV, XXV and XVII (DE # 136). After the conclusion of a three day, non-jury trial, April 29 through May 2, 1994, the Court directed the parties to submit supplemental briefs on the issues of: (1) whether the tort of conversion requires a showing of intent under Florida law and (2) the effect of loan assignments on the allegations in the Plaintiff's Complaint.[1]

In approximately February, 1981, Trans Florida applied to the SBA for a license to operate as an SBIC. On December 17, 1981, the SBA approved the application for a license to operate. This was confirmed by a December 29, 1981 letter from the SBA to Trans Florida. On November 4, 1982, Trans Florida applied to the SBA for permission to transfer control of the corporation. The new controlling shareholders of Trans Florida were to be Alexander Echevarria and Oswald Morales ("Morales"). Alexander was to obtain a 28 percent ownership interest and Morales was to obtain a 25 percent ownership interest in Trans Florida. On January 7, 1983, the SBA granted approval for the transfer of control. At or about that time, Alexander began to participate in the operations of Trans Florida.

The transactions at issue in this litigation took place in 1983, when Alexander and his parents owned almost one-half of the shares of Trans Florida (230,000 out of 500,000). Guido and Mercedes collectively owned 18 percent of the outstanding stock of Trans Florida while Alexander owned 28 percent of the outstanding stock.

## A. U.S. PINE LOANS

Between February, 1983 and December 1983, Trans Florida loaned $262,500 to a company called U.S. Pine International Corp. ("U.S. Pine"). As a recipient of loan money from Trans Florida, U.S. Pine was a "Portfolio Concern" of Trans Florida. A Portfolio Concern is an entity that receives loans from an SBIC. 13 C.F.R. § 107.3. Of the $262,500 loan, three checks totaling $112,500 were signed by Alexander in his capacity as Vice–President, Director and Chief Financial Officer of Trans Florida. Alexander also signed the loan reports authorizing the distributions.

---

1. The issue of what effect the assignments of various loans has on the Plaintiff's causes of action was never raised by the Defendants in any of their responsive pleadings and was first brought out during the trial. The Court permitted the parties to file post-trial, supplemental briefs on this issue. While Fed.R.Civ.P. 15(b) permits amendments to the pleadings to conform to the evidence presented at trial, such amendments are only permitted if the opposing party consents or the court concludes that the opposing party will suffer no prejudice. *See Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir.1986), *cert. denied*, 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987). After reviewing the briefs on this issue, the Court concludes that the Plaintiff would be prejudiced by permitting such an amendment. Consequently, the Court will restrict its analyses to the defenses raised by the Defendants in their responsive pleadings.

At the time the U.S. Pine loans were made, Guido owned 15 percent of the U.S. Pine stock. This loan was never repaid to Trans Florida.

In December, 1983, approximately two weeks after the last loan by Trans Florida to U.S. Pine, Alexander and Maite contracted to purchase a residence from U.S. Pine located at 5800 Granada Boulevard, Coral Gables, Florida. Under the terms of the written contract, the price was set at $200,000, with a $50,000 deposit and a $150,000 bank loan to be obtained by Alexander and Maite. The sale closed in July, 1984.

Despite their representation on the loan application that a $50,000 cash deposit had been paid to U.S. Pine, Alexander and Maite never actually paid the deposit. Instead, they spent approximately $58,000 repairing and renovating the home. Most of the money was spent before they actually acquired title to the property. These expenditures are not reflected in the contract.

Following the completion of the renovations but prior to taking title to the home, Alexander and Maite had appraisals done on the home. The first, conducted on February 14, 1984, listed the value of the house as $258,500 (Pl.Ex. 16). The second, conducted four months laster on June 12, 1984, listed the home's value at $245,000 (Pl.Ex. 16). Alexander and Maite closed on the home in July, 1984. Alexander never sought or obtained permission from the SBA to purchase the home on the foregoing terms.

## B. KEY LARGO MARINA AND KAWAMA LOANS

In April, 1983, Trans Florida provided $600,000 as a loan to Key Largo Marina Services, Inc. ("Key Largo Marina") to assist in the acquisition of a townhouse and marina project in Key Largo, Florida. The seller of the development was Paradise Yacht Club of Key Largo, ("Paradise Yacht"). Prior to 1983, Guido was a principal stockholder of Paradise Yacht, owning 50 percent of the stock and serving as its President and Director. The buyer of the property, Key Lar-

go Marina, was also owned and controlled by Guido and several business associates. Guido owned 50 percent of the shares of Key Largo Marina. One of the two listed directors of Key Largo Marina was Alexander's father-in-law, Fernando Mirabal.

On April 29, 1983, Trans Florida, under signed directions from Defendant Alexander, caused two cashier's checks to be drawn on the bank account of Trans Florida, one for $300,000 payable to Kawama International Resorts Ltd., Inc. ("Kawama") (Pl.Ex. 27) and one for $300,000 payable to Key Largo Marina (Pl.Ex. 28). Kawama was also owned by Defendant Guido and his partners. Guido owned 50 percent of the stock and served as its President and Director[2].

The cashier's checks payable to Kawama and Key Largo were endorsed to and deposited in the bank account of Paradise Yacht, Guido's company. (Pl.Ex. 30). Guido disbursed $400,000 of the money approximately two weeks later, by check. (Pl.Ex. 31). Another $136,000 was also disbursed by a check, signed by Defendant Guido to Euro Funds International, Inc. (Pl.Ex. 32). No such corporation exists in Florida. It is allegedly a Panamanian corporation owned by one of Guido's partners.

In exchange for the $600,000 of disbursements, Trans Florida only received a $300,000 mortgage on the Key Largo property. The discrepancy of $300,000 was never explained or accounted for by any of the Defendants. During the year after the initial $600,000 was paid out by Trans Florida, Trans Florida transferred an additional $295,000 to Kawama. One transfer was in September, 1983 by a check, signed by Alexander, for $200,000 (Pl.Ex. 35). The other transfer was in July, 1984 by a check, signed by Alexander and Guido, for $95,000 (Pl.Ex. 37). No mortgage or mortgage modification for these amounts were given to Trans Florida. The Key Largo project ultimately failed, and the property was lost in foreclosure. None of the $895,000 advanced by Trans

**2.** Guido testified in his deposition that he owned 50 percent of Kawama but a stock purchase agreement, dated August 5, 1985 (Pl.Ex. 21), memorializes his sale of 100 shares of Kawama to Christian Communications, Inc. That sale would constitute all the shares of Kawama.

Florida to Key Largo and/or Kawama, was ever repaid to Trans Florida.

On July 6, 1988, Pursuant to an Order entered by the Hon. Alcee Hastings in the U.S. District Court for the Southern District of Florida, Case No. 88–0299–CIV–HAS-TINGS, the SBA was appointed to act as Receiver for Trans Florida, based upon numerous violations by Trans Florida of the SBIA and the Regulations promulgated thereunder, as contained in 13 C.F.R. § 107.1, *et seq.* ("the Regulations").

Following Judge Hastings' appointment of the SBA as receiver for Trans Florida, the SBA assigned James Chapel ("Chapel") to investigate Trans Florida's finances and marshall any assets the failed SBIC might have. Chapel testified he received two boxes of documents containing Trans Florida's financial records on August 10, 1988. Prior to that time, the SBA did not know that the Defendants were using Trans Florida to loan money to entities in which they held ownership interests. The SBA was only aware that Trans Florida was in financial trouble. After reviewing the documents and conducting further investigations, Chapel testified that he concluded in 1989 that the Defendants had engaged in self-dealing. Chapel stated that it was only the release of documents in 1988 and 1989 that provided him with sufficient information to reach that conclusion.

In January, 1991, Plaintiff SBA, as Receiver for Trans Florida, commenced this action against various officers, directors and stockholders of Trans Florida, in furtherance of the Plaintiff's duties as Receiver for an SBIC. Because the SBA Regulations contain no civil penalty provisions, the Plaintiff asserted various state law tort claims against the Defendants based upon their violation of the Regulations by "self-dealing" or making loans to entities in which they held ownership interests.

## II. CONCLUSIONS OF LAW

### A. STATUTE OF LIMITATIONS

■ Defendants Alexander and Maite claim, as an affirmative defense, that the claims against them are barred by the stat-

ute of limitations because the SBA was on notice that Trans Florida's Officers and Directors had violated numerous SBA rules and regulations as early as 1986. The statute of limitations applicable to conversion is four years and begins to run at the time of the conversion, except when the conversion is fraudulently concealed. Fla.Stat. § 95.11(3); *Bove v. PBW Stock Exchange, Inc.*, 382 So.2d 450 (Fla.Dist.Ct.App.1980). Similarly, the statute of limitations for RICO is four years and begins to run when the plaintiff knows or should know of the injury. *Wilder v. Meyer*, 779 F.Supp. 164 (S.D.Fla.1991). There is no statute of limitations for the imposition of a constructive trust. Instead, the doctrine of laches applies. *Ruff v. Lake Abstract Guar. Co.*, 101 B.R. 763 (Bankr. M.D.Fla.1989).

The Court finds that based upon the testimony of the SBA's investigator Chapel, the earliest time the Plaintiff could have brought this action was 1989, when Chapel discovered that the Defendants had engaged in self-dealing. The SBA filed this Complaint in 1991, thus this action was brought within the four-year applicable statute of limitations. There was no evidence that the Plaintiff unreasonably rested on its rights to assert its claim for a constructive trust, thus the doctrine of laches does not apply. *Wadlington v. Edwards*, 92 So.2d 629 (Fla.1957).

### B. SBA REGULATIONS

■ It is largely undisputed that the Defendants were involved in loans that violated SBA regulations prohibiting self-dealing. However, violation of these regulations, in and of themselves, does not give rise to liability. An SBIC found in violation of SBA regulations faces only the loss of its license and a federal receivership to administer its assets. 15 U.S.C. § 687(d), 687c; *U.S. v. Norwood Capital Corp.*, 273 F.Supp. 236 (D.C.S.C.1967). Instead, the Plaintiff SBA, as receiver for Trans Florida, based the causes of action in this Complaint on state tort law, including civil RICO, breach of fiduciary duty, civil theft and conversion. Thus there were two levels to the presentation of the Plaintiff's case. First, the SBA sought to prove that the Defendants violated SBA

rules prohibiting self-dealing. Second, the SBA attempted to show that by violating these regulations the Defendants also committed torts under state law. Therefore, in analyzing this case, the Court will first determine whether the Defendants violated the SBA regulations and then determine whether these violations give rise to tort liability.

An officer or director of a SBIC (also known as an SBA "Licensee") may not take any action relating to his management of the company that is in breach of his fiduciary duty to the company and causes the company to suffer financial loss. *See* 15 U.S.C. § 687f(b). Congress has delegated authority to the SBA to promulgate regulations to curb conflicts of interest involving Licensees, such as Trans Florida. *See* 15 U.S.C. § 687d[3].

Conflicts of interest involving Licensees are prohibited by 13 C.F.R. § 107.903. The regulations state, in pertinent part:

(a) General. Self-dealing to the prejudice of the Small Concern, or of a Corporate Licensee or its shareholders, or, in the case of an Unincorporated Licensee, the partnership or its members, or of SBA, is prohibited.

(b) Prohibitions. Except where a prior written exemption may be granted by SBA in special instances in furtherance of the purposes of the Act:

(1) A Licensee shall not, directly or indirectly, provide Financing to any of its Associates.

. . . . .

(4) No Licensee shall directly or indirectly provide Financing to discharge or to free other funds for use in discharging an obligation to an Associate of the Licensee: Provided, however, That the foregoing shall not apply to transactions by Associate Lending Institutions in the normal course of business involving lines of credit or short-term financing.

(5) No Licensee shall directly or indirectly Finance, except as permitted by § 107.901(g), the purchase of property from an Associate of the Licensee.

"Associates" of a licensee include: "[a]n officer, director, employee or agent of a corporate Licensee." 13 C.F.R. § 107.3(a)(1). Any close relative of an Associate is also considered an Associate of the Licensee. 13 C.F.R. § 107.3(e). "Close relatives" include the sons and daughters, siblings, spouses, aunts, uncles and in-laws of any Associate. 13 C.F.R. § 107.3.

Based upon these definitions, Alexander, by virtue of his position as Director, Vice-President, Secretary, Treasurer, General Manager and Chief Financial Officer of Trans Florida, is a Trans Florida Associate because he is an officer and director of a Licensee. The other Defendants are also Associates by virtue of their familial relationship with Alexander, including his parents, Guido and Mercedes[4] and Alexander's wife Maite. Furthermore, Fernando Mirabal, one of the Directors of Key Largo Marina, is also an Associate because he is Alexander's father-in-law.

The Court finds that Alexander Echevarria violated SBA regulations prohibiting self-dealing by providing financing to Associates of a Licensee. Specifically, Alexander authorized the issuance of $262,500 in loans to U.S. Pine, a corporation in which his father Guido held a 15 percent ownership interest. Alexander also provided $895,000 in loans to Kawama and Key Largo Marina, which were also partially owned or controlled by Trans Florida Associates, including defendant Gui-

---

**3.** 15 U.S.C. § 687d states: For the purpose of controlling conflicts of interest which may be detrimental to small business concerns .. the Administration shall adopt regulations to govern transactions with any officer, director, shareholder, or partner of any small business investment company, or with any person or concern, in which any interest, direct or indirect, financial or otherwise, is held by any officer, director, shareholder or partner of (1) any small business investment company, or (2) any person or concern with an interest, direct or indirect, financial or otherwise, in any small business investment company.

**4.** Guido and Mercedes Echevarria, by virtue of their joint-ownership of 18 percent of the Trans Florida stock, could also be considered an Associate by virtue of his ownership, or control, of more than 10 percent of the stock of a Licensee. 13 C.F.R. 107.3(b). Guido is also an Associate based upon his position as a Trans Florida director. 13 C.F.R. 107.3(a)(1).

do and Alexander's father-in-law, Fernando Mirabal. The Court will now turn its attention to the issue of whether these violations of SBA regulations also give rise to tort liability, as alleged in the Plaintiff's Complaint.

## C. COUNTS I AND VI: CONVERSION AGAINST GUIDO ECHEVARRIA, MERCEDES ECHEVARRIA AND ALEXANDER ECHEVARRIA

 Under Florida law, conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time. *National Union Fire Insurance Co. v. Carib Aviation, Inc.*, 759 F.2d 873 (11th Cir. 1985). Acquisition of the property is unimportant. The essence of the tort of conversion is a party's refusal to surrender the property after demand has been made. *Murrell v. Trio Towing Service, Inc.*, 294 So.2d 331 (Fla.Dist.Ct.App.1974); *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 160 Fla. 130, 33 So.2d 858 (1948) (en banc). The type of personal property subject to conversion includes money, so long as it consists of a specific amount of money capable of identification. *Belford Trucking Co. v. Zagar*, 243 So.2d 646 (Fla.Dist.Ct.App.1970).

 The parties briefed the question of whether intent is a necessary element of conversion after the trial, at the Court's direction. In its Order on the parties' Cross Motions for Summary Judgment (DE # 154), the Court recognized that there is a split of authority among Florida courts as to whether a party must intend to deprive another of its property to find conversion. *See Star Fruit Co.*, 33 So.2d at 858; (positive overt act of dominion with intent required to find conversion); *Wilson Cypress Co. v. Logan*, 162 So. 489, 120 Fla. 124 (Fla.1935) (conversion requires taking of chattels with intent to deprive owner of possession); *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So.2d 1157 (Fla.Dist.Ct.App.1984) (essence of conversion is wrongful possession of another's property with a present intent to deprive them of possession); *In re: Eli Witt*

*Co.*, 12 B.R. 757 (Bankr.M.D.Fla.1981) (conversion must be an intentional deprivation of or interference with the dominion and control over the property of another). *But see Stearns v. Landmark First Nat'l Bank*, 498 So.2d 1001 (Fla.Dist.Ct.App.1986) (knowledge or intent not a necessary element of a cause of action for conversion), *citing Eagle v. Benefield–Chappell, Inc.*, 476 So.2d 716, 718 (1985 Fla.Dist.Ct.App.) (liability for conversion does not require proof of knowledge or intent to deprive another of their property); *Klein v. Newburger, Loeb & Co.*, 151 So.2d 879 (Fla.Dist.Ct.App.1963) (party who came into possession of stock certificates through mistake or inadvertence guilty of conversion despite lack of intent).

 In diversity cases arising under Florida law, federal courts are bound by the decisions of the Florida Supreme Court. *See Allstate Ins. Co. v. Travers*, 703 F.Supp. 911, 914 (N.D.Fla.1988). If an issue has not been addressed by the Florida Supreme Court, Florida District Court of Appeals decisions control unless there is persuasive proof that the Supreme Court would rule otherwise on the issue. *Id.*, at 914–915; *see also Blanchard v. State Farm Mut. Auto Ins. Co.*, 903 F.2d 1398, 1399 (11th Cir. 1990). If the cases are split, the federal court should apply the rule representing the overwhelming weight of authority. *See Liberty Mut. Ins. Co. v. Electronics Systems, Inc.*, 813 F.Supp. 802, 805 (S.D.Fla.1993). When the weight of authority is evenly balanced, the court must make an "educated guess" as to how the Florida Supreme Court would resolve the conflict. *Id.*, at 805, *citing Trial Builders Supply Co. v. Reagan*, 409 F.2d 1059, 1061 (5th Cir.1969)[5].

The Florida Supreme Court has not set forth the elements constituting the tort of conversion in more than 40 years. *See Star Fruit*, 33 So.2d at 858, *supra*. The Court has examined the cases addressing this issue and concludes that if the Supreme Court chose to revisit the issue, it would not disturb its prior rulings holding that intent is a necessary element of conversion. Specifically,

---

**5.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the 11th Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

the Court follows the Third District Court of Appeals decision in *Senfeld*, which found that "the essence of conversion is not the possession of property by the wrongdoer but rather such possession in conjunction with a present intent ... to deprive the person entitled to possession of the property." *Senfeld*, at 1161. While the weight of authority supporting that position is not overwhelming it is clearly the prevailing view, as the Court previously found in its order on the parties' Cross Motions for Summary Judgment.

The Plaintiff contends that Alexander committed conversion when he authorized $895,000 in loans from Trans Florida to Kawama and Key Largo Marine and $262,500 to U.S. Pine. As discussed *supra*, these loans constituted self-dealing prohibited by the SBA regulations, therefore they were an "unauthorized act," satisfying the first element of conversion. *See Aubin v. H. Hentz & Co.*, 303 F.Supp. 1119 (S.D.Fla.1969). Alexander's misappropriation of the loan money served to deprive the money's rightful owner—Trans Florida—of its property, thus the second element has been met. *See Bergen Brunswig Corp. v. State Dept. of Health and Rehabilitative Services*, 415 So.2d 765 (Fla. Dist.Ct.App.1982). It is undisputed that the SBA made a demand of the money from Alexander and that Alexander refused to repay the loans. *See Murrell*, 294 So.2d at 331.

 The remaining issue for the Court to determine is whether the Plaintiff has demonstrated, by a preponderance of the evidence, that Alexander intended to convert the Kawama, Key Largo Marine and U.S. Pine loans[6]. Alexander does not dispute that he signed the checks and the applicable loan documents authorizing the disbursements. His defense, as he testified from the witness stand, was that at the time he signed these documents he was a naive, 23-year-old, who placed his trust in fellow Trans Florida Director Antonio Bechiley's knowledge of SBA regulations. Essentially, Alexander

testified that he signed whatever Bechiley put in front of him and did not ask questions. Moreover, at the time he authorized the loans, Alexander testified he was completely unaware that his father held ownership interests in any of the companies that received the loan proceeds. This contention was supported by his father, Guido Echevarria, who testified that he never discussed his business interests with his family.

The Court does not accept Alexander's assertions of ignorance as to his father's business holdings. Alexander testified that prior to assuming control of Trans Florida in 1983, he worked briefly as a salesman at Paradise Yacht Club. Alexander's father Guido owned 50 percent of Paradise Yacht Club, which was the seller of the property purchased by Kawama and Key Largo Marine with loan proceeds from Trans Florida. The Court also does not accept Alexander's statements that he was ignorant, not only of his father's business interests, but of his father-in-law's position as President of Key Largo Marina. Finally, the Court does not accept as credible Alexander's testimony that he had no idea that his father had a business relationship with U.S. Pine. Alexander's father informed Alexander that the Coral Gables house Alexander sought to purchase from his father was owned by U.S. Pine.[7]

The Court finds that Alexander's statements that he relied completely upon Antonio Bechiley's knowledge of SBA regulations, even if true, do not constitute a valid defense in this action. In *Norwood Capital*, the court found that the President of an SBIC was presumed to be aware of the SBA laws and regulations governing his family-owned company. 273 F.Supp. at 241.

There was no evidence that Alexander lacked the capacity to authorize the illegal loans in question. It is undisputed that at or about the time Alexander authorized the loans, he had closed on the purchase of a

---

**6.** The Court denied the Plaintiff's Motion for Summary Judgment on Count I for conversion against Alexander, based upon the Court's finding that a material issue of fact existed as to whether Alexander intended to deprive Trans Florida of its property. (Order on Cross Mots. for Sum. Jud., at p. 5).

**7.** Although the sale of the house to Alexander and Maite occurred after Trans Florida's loan to U.S. Pine, Alexander did not state that he was concerned that his father, as an Associate of Trans Florida, had sold property to a Portfolio Concern.

house and had studied business at the University of Miami. Accordingly, the Court finds that the Plaintiff has demonstrated, by a preponderance of the evidence, that Alexander acted with intent in authorizing loans of $895,000 to Kawama and Key Largo Marina and $262,500 to U.S. Pine, thereby depriving Trans Florida of those funds.

In *Small Business Administration v. Segal*, 383 F.Supp. 198, 204 (D.Conn.1974), the court found that the SBA, as receiver for a failed SBIC, was entitled to a judgment against the former officers and directors of the company for losses sustained by the company as a result of loans made in violation of the Act and the SBA regulations. The court found that loans made by the directors in violation of the Act and SBA regulations were ultra vires, therefore the defendants were subject to liability for authorizing the illegal loans. *Id.* at 203. The *Segal* court found its authority to impose this liability rooted in the provision of the Act granting the SBA the authority to act as trustee or receiver of the licensee. *Id.;* 15 U.S.C. § 687c(b).

■■■ The doctrine of ultra vires states that a contract made by a corporation beyond the scope of its corporate powers is unlawful and void. *Sommers v. Apalachicola Northern R. Co.*, 75 Fla. 159, 195, 78 So. 25 (Fla. 1918). Accordingly, as an alternative ground, the Court finds that Alexander is liable for the loans wrongfully made on behalf of Trans Florida because the loans were ultra vires. *See Segal,* at 204.

The claim for conversion against Guido warrants little discussion. At the trial, Guido testified that as a director of Trans Florida "all the decisions made in that company, good or bad, were made by [Antonio] Bechiley and me." While he contended that he did not tell his son Alexander about his ownership interests in Kawama, Key Largo Marina and U.S. Pine, Guido did not dispute that he had such holdings and that he directed loans to those entities in contravention of SBA regulations. Accordingly, the Plaintiff has proven by a preponderance of the evidence that Guido committed conversion of the loan proceeds to U.S. Pine, Key Largo Marine and Kawama.

■■■ There was no evidence that Mercedes Echevarria acted with intent to deprive Trans Florida of any money. Accordingly, judgment shall be entered for Defendant Mercedes on the Plaintiff's claim for conversion.

## D. COUNTS XII AND XXII: CIVIL THEFT AGAINST ALEXANDER ECHEVARRIA AND GUIDO ECHEVARRIA

■■■ The civil theft statute, Fla.Stat. § 772.11, provides a civil remedy for violations of the criminal theft statute, Fla.Stat. §§ 812.012–812.037 (1990). *Denson v. Stack,* 997 F.2d 1356, 1362 (11th Cir.1993). The criminal theft statute states:

(1) a person commits theft if he knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit therefrom.

(b) Appropriate the property to his own use or to the use of any person not entitled thereto.

Fla.Stat. § 812.014. To assert a cause of action under the Civil Theft statute, a party must prove by clear and convincing evidence that the party: (1) suffered some injury caused by Defendant's violation of one or more provisions of the criminal theft laws and (2) had a legally recognized property interest in the item stolen. *Balcor Property Management, Inc. v. Ahronovitz,* 634 So.2d 277, 279 (Fla.Dist.Ct.App.1994). If the civil theft claim is successful, the Plaintiff is entitled to treble damages, as long as there is no contractual relationship between the parties. Fla.Stat. § 772.104; *see also Leisure Founders, Inc. v. CUC Int'l., Inc.,* 833 F.Supp. 1562 (S.D.Fla.1993).

■■■ The primary difference between conversion and civil theft is the standard of proof the court must apply. Under Florida law, a party must prove conversion by a preponderance of the evidence. *See Sharps v. Sharps,* 214 So.2d 492 (Fla.Dist.Ct.App. 1968); *Sears, Roebuck & Co. v. Parker,* 156 B.R. 858 (Bankr.N.D.Fla.1993); *In re Triggi-*

*ano,* 132 B.R. 486 (Bankr.M.D.Fla.1991). In contrast, civil theft requires the higher clear and convincing evidence standard. Fla.Stat. § 772.104. Clear and convincing evidence is an intermediate standard, between the preponderance of the evidence standard and the criminal beyond a reasonable doubt standard. *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir.1976).

■ While the evidence presented by the Plaintiff as to Alexander and Guido's intent to deprive Trans Florida of its loan proceeds was greater than the evidence the Defendants presented to the contrary, the Court does not find that it meets the clear and convincing evidence standard. Accordingly, the court finds for the Defendants on counts XII and XXII for civil theft.

### E. COUNT XXV: BREACH OF FIDU-CIARY DUTY AGAINST GUIDO ECHEVARRIA, MERCEDES ECHE-VARRIA AND ALEXANDER ECHE-VARRIA

■ Under Florida law, a corporate director or officer "occupies a quasi-fiduciary relationship to the corporation and the existing stockholders. He is bound to act with fidelity and the utmost good faith." *Everdell v. Preston,* 717 F.Supp. 1498, 1501 (M.D.Fla. 1989) quoting *Farber v. Servan Land Co., Inc.,* 662 F.2d 371, 377 (5th Cir.1981) (citations omitted).

■ In the context of the SBIA, the scope of the fiduciary's duty is spelled out in 15 U.S.C. § 687d and 13 C.F.R. § 107.903, which defines conflicts of interest. As discussed *supra,* Alexander violated 13 C.F.R. § 107.903 by engaging in self-dealing that caused damages to Trans Florida. The Plaintiff contends that the $262,500 loan from Trans Florida to U.S. Pine and the loans of $895,000 to Kawama and Key Largo Marina were never repaid, thus the Defendants' self-dealing proximately caused the SBA's loss.

In its Order on the parties' Cross–Motions for Summary Judgment, the Court found a material issue of fact existed as to whether Alexander acted in bad faith. Consistent with this Court's earlier determination finding that Alexander acted with intent with regard to the Plaintiff's conversion claim, the Court similarly finds that the Plaintiff has proven by a preponderance of the evidence that Alexander acted with bad faith when he authorized loans to Trans Florida Associates. *See Everdell* at 1501.

The Court also concludes that Guido, as a director of Trans Florida, breached his fiduciary duty to the company based upon his assertions that he knowingly orchestrated Trans Florida loans to companies in which he held ownership interests.

### F. COUNTS XXIII AND XIV: IMPOSI-TION OF A CONSTRUCTIVE TRUST AGAINST ALEXANDER AND MAITE ECHEVARRIA

■ Under Florida law, equity principles can create a constructive trust in property and compel its restoration, where an individual through actual fraud, abuse of confidence or other questionable means, gains the property for himself which in equity and good conscience he should not be permitted to hold. *ITT Community Development Corporation v. Barton,* 457 F.Supp. 224 (M.D.Fla. 1978), citing *Quinn v. Phipps,* 93 Fla. 805, 113 So. 419 (1927);

■ A constructive trust may be imposed only where the res is specific, identifiable property or can be clearly traced in assets of the defendant which are claimed by the party seeking relief, and may not be imposed on defendant's general assets. *Finkelstein v. Southeast Bank, N.A.,* 490 So.2d 976, 983 (Fla.Dist.Ct.App.1986); *Landers v. Sherwin,* 261 So.2d 542 (Fla.Dist.Ct.App.), *cert. denied, sub nom.,* 265 So.2d 49 (Fla.1972); *Trend Setter Villas v. Villas on the Green, Inc.,* 569 So.2d 766 (Fla.Dist.Ct.App.1990). The court in *Trend Setter Villas* found that there was no evidence presented that any specific property was obtained by two of the plaintiffs through an inequitable transaction, thus a constructive trust was not warranted. *Id.* at 768.

■ The property the Plaintiff contends that Alexander and Maite Echevarria allegedly gained "through actual fraud, abuse of confidence or other questionable means" is a home they purchased, allegedly at a discount,

from U.S. Pine, a Portfolio Concern of Trans Florida. The Plaintiff contends that the couple bought a home valued at approximately $251,750 for $208,000, thus they were unjustly enriched by $43,750.

The Court finds that the Plaintiffs have demonstrated that Alexander and Maite obtained the 3–bedroom, 2–bath house at 5800 Granada Blvd. in Coral Gables "through actual fraud, abuse of confidence or other questionable means," thus the first requirement for the imposition of a constructive trust has been met. *Barton*, 457 F.Supp. at 224. As discussed *supra*, Alexander authorized the $262,500 loan to U.S. Pine and obtained property from U.S. Pine, an Associate of a Licensee, in violation of SBA regulations. See 13 C.F.R. § 107.903(b)(5). While this action may not rise to the level of actual fraud under Florida law, the Court finds that it does constitute the acquisition of property by "questionable means."

The next requirement to impose a constructive trust is that the property sought must either be (1) specific and identifiable or (2) clearly traced as assets held by the defendant. *Finkelstein*, 490 So.2d at 983.

The Plaintiff arrived at the $43,750 figure by taking the average of the two appraisals of the home conducted by Alexander and Maite ($251,750) and subtracting the amount the couple actually paid for the house ($208,-000)[8]. In essence, the SBA seeks to hoist Alexander and Maite by the own petard, by taking the high appraisal figures they used to ensure they were getting a good deal as evidence of their unjust enrichment. In order to impose a constructive trust, the Court must find that this average appraisal figure is sufficiently accurate to demonstrate that Alexander and Maite obtained specific and identifiable property or property that can be clearly traced to the Plaintiff.

First, the Court notes that appraising a home is not an exact science and is inherently subjective. The second appraisal stated that the home was worth $13,500 less than the first appraisal, conducted just four months earlier. Second, there was conflicting evidence as to what facts the appraisers considered in determining the house's value. The February 14, 1984 appraisal of $258,000 states that "[t]his appraisal report and value conclusion *is contingent upon the completion of the proposed improvements as per the plans and specifications*. (Pl.Ex. 16, p. 2) (emphasis supplied). Maite testified that one of the appraisers relied upon plans submitted in December 1983, which included a swimming pool patio, paved brick driveway and landscaping that were never completed.

In sum, the Court finds that the Plaintiff did not prove by a preponderance of the evidence that Alexander and Maite obtained specific and identifiable property or property that could be clearly traced to the Plaintiff. Accordingly, judgment will be entered for the Defendants on Count XXIII seeking imposition of a constructive trust.

## G. COUNT XXVII: RICO VIOLATIONS AGAINST GUIDO ECHEVARRIA, MERCEDES ECHEVARRIA AND ALEXANDER ECHEVARRIA

■ To prove a violation of the civil provisions of the Racketeer Influenced Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962, 1963, 1964, *et seq*, a Plaintiff must establish the following four elements: (1) income derived from a "pattern" of racketeering or the collection of an unlawful debt, (2) the use or investment of the income in the acquisition, establishment, or operation by a defendant (3) of an "enterprise" (4) engaged or affecting interstate commerce. *Pelletier v. Zweifel*, 921 F.2d 1465, 1489–90, 1518–19 (11th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).

The Supreme Court defined the "enterprise" element in *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), stating that:

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engag-

---

8. This figure is undisputed. Alexander and Maite paid U.S. Pine $150,000 in the form of a mortgage loan and spent an additional $58,000 on renovations. The $50,000 deposit to U.S. Pine listed on the loan application was never actually paid but was instead applied to the renovation costs.

ing in a course of conduct ... The [enterprise] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

452 U.S. at 583, 101 S.Ct. at 2528.

■ In considering the Defendants' motions for summary judgment, the Court found that a material issue of fact existed as to whether the Defendants constituted an "enterprise." Specifically, the Court found that the Plaintiffs had not produced sufficient evidence to demonstrate that the Defendants "function[ed] as a continuing unit."

Having reviewed the evidence, including the testimony of the witnesses at trial, the Court concludes that the SBA has not demonstrated, by a preponderance of the evidence, that the Defendants functioned as a continuing unit to satisfy the RICO statute.

## H. DAMAGES

■ Under Florida law, damages for conversion are limited to the reasonable value of the property when converted. *Gillette v. Stapleton,* 336 So.2d 1226, 1227 (Fla.Dist.Ct. App.1976); *Lilly v. Bronson,* 129 Fla. 675, 177 So. 218 (Fla.1937). It is undisputed that the total amount of the Kawama, Key Largo and U.S. Pine loans is $1,157,500. Having found that the Plaintiffs have failed to establish their claims for civil theft and RICO, the Plaintiff is not entitled to treble damages.

It is ORDERED AND ADJUDGED as follows:

Final judgment shall be hereby entered in favor of Plaintiff SBA, as Receiver for Trans Florida Capital Corp. and against Defendants Alexander Echevarria and Guido Echevarria, Sr., jointly and severally, for damages in the amount of $1,157,500, together with prejudgment interest, at the statutory rate from April 24, 1984 through the date hereof, for all of which let execution issue.

DONE AND ORDERED.